**Marion GEORGE, Individually and as Executrix of the Estate of Stuart George, Deceased, Plaintiff–Appellee,**

v.

**The CELOTEX CORPORATION, Individually and as successor in interest to Philip Carey Corporation, Defendant–Appellant.**

No. 1339, Docket 90–7144.

United States Court of Appeals, Second Circuit.

Argued May 22, 1990.

Decided Sept. 13, 1990.

Donald I. Marlin (Perry Weitz, P.C., New York City, of counsel), for plaintiff-appellee.

Rosanne C. Kemmet (McCarter & English, Newark, N.J., of counsel), for defendant-appellant.

Before VAN GRAAFEILAND, MESKILL and WALKER, Circuit Judges.

WALKER, Circuit Judge.

The Celotex Corporation ("Celotex") appeals from a judgment awarding plaintiff Marion George, on her own behalf and as executrix of her husband Stuart George's estate, damages in strict liability arising from her husband's exposure to asbestos manufactured by Celotex. Celotex argues that the district court (a) improperly admitted a certain scientific report into evidence on the issue of the current state of the art, and (b) erroneously let stand a jury allocation of 90 percent liability against Celotex in the face of contrary evidence. Because we disagree with both assertions, we affirm the judgment of the district court.

## BACKGROUND

Stuart George, plaintiff's Marion George's decedent, was employed for 58 years as a purchasing agent by the Robert A. Keasbey Company ("Keasbey"), an asbestos insulation contractor and distributor. From approximately 1931 until his retirement in 1975, George would leave his office on a daily basis to visit the warehouse where asbestos was unpacked, stored on open racks, packed and shipped, and was thus exposed to asbestos dust. From 1903 until 1965, Keasbey was the New York area's exclusive distributor for the full line of asbestos products manufactured by Celotex's predecessor, the Philip Carey Company ("Philip Carey"). Keasbey's former president, who was employed with the company from 1931 to 1989, testified that while in more recent years Keasbey distributed the products of other manufacturers, "in the early years" Keasbey handled "almost all Carey products."

In 1976, Stuart George died of mesothelioma, a lung cancer caused by the inhalation of asbestos dust. Mesothelioma has a latency period between exposure to asbestos dust and the occurrence of the disease of up to forty years.

Plaintiff initially sued sixteen defendants, all of whom, save Celotex, had settled or otherwise obtained dismissals by the time the jury reached a verdict in this case. Accordingly, the jury returned a verdict against Celotex alone in the amount of $700,000 with liability apportioned 90% against Celotex and 10% spread among four other manufacturers. On November 3, 1989, after reducing the award to account for settling defendants, Judge Nickerson entered judgment against Celotex in the amount of $588,000. On January 4,

1990, Judge Nickerson denied Celotex's motions for a judgment notwithstanding the verdict or, in the alternative, a new trial that raised, *inter alia*, the two issues now before us. This appeal followed.

## DISCUSSION

### A. *The Hemeon Report*

Celotex argues that Judge Nickerson erred by receiving in evidence a report written in 1947 known as the Hemeon Report as it was both hearsay and irrelevant to the issue of liability. Even if relevant and admissible, Celotex argues, the district court abused its discretion by refusing to exclude it as unfairly prejudicial pursuant to Fed.R.Evid. 403.

■ The district court's determination of relevance will not be disturbed unless it evidences an abuse of discretion. *See McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2d Cir.1988). Our inquiry into the relevance of the Hemeon Report begins with plaintiff's theory of liability at trial. Plaintiff sought to prove that Philip Carey breached its duty to warn users of its asbestos products, such as the plaintiff, of latent dangerous defects of which it "ha[d] knowledge or by the application of reasonable developed human skill and foresight should have [had] knowledge ..." Restatement (Second) of Torts § 402A comment J (1966).

■ We agree with the plaintiff that a manufacturer such as Philip Carey is held to the knowledge of an expert in its field, *Borel Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1089 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); *see also Dartez v. Fibreboard Corp.*, 765 F.2d 456, 461 (5th Cir.1985); *Wright v. Carter Products*, 244

F.2d 53, 59 (2d Cir.1957), and therefore has a duty "to keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby." *Borel*, 493 F.2d at 1089 (citing Keeton, *Product Liability—Problems Pertaining to Proof of Negligence*, 19 S.W.L.J. 26, 3033 (1965)); *see also* 1 L. Frumer & M. Friedman, *Products Liability* § 2.22[1] at 2–1062–64 (1990) (collecting cases) ("manufacturer must keep abreast of scientific advances and is under a duty to make tests to ascertain the nature of its product. In this scientific age the manufacturer undoubtedly has or should have superior knowledge of his product."). In addition, a manufacturer has a duty to test fully and inspect its products to uncover all dangers that are scientifically discoverable. *Id.* at 1089–90; *Dartez*, 765 F.2d at 461.[1]

■ In fulfilling its duty, a manufacturer may not rest content with industry practice, for the industry may be lagging behind in its knowledge about a product, or in what, with the exercise of reasonable care, is knowable about a product. *T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.), *cert. denied* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932); *Eaton v. Long Island Rail Road Company*, 398 F.2d 738, 742 (2d Cir.1968); *Kane v. Branch Motor Express Co.*, 290 F.2d 503, 507 (2d Cir.1961); *Hall v. E.I. DuPont De Nemours and Co.*, 345 F.Supp. 353, 378 (E.D.N.Y.1972); *Bolm v. Triumph Corp.*, 71 A.D.2d 429, 422 N.Y.S.2d 969, 975 n. 2 ("state of the art refers to what is realistically capable of achievement, not merely industry custom.") As Judge Learned Hand wrote in the venerable *T.J. Hooper*,

[a] whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own

---

**1.** New York law is not to the contrary. New York's "doctrine of strict products liability generally follows the guidelines set forth in § 402A," *Farina v. Niagara Mohawk Power Corp.*, 81 A.D.2d 700, 438 N.Y.S.2d 645, 646 (3d Dep't 1981), including the expansion of the doctrine that has occurred in both federal and state courts. *Id.* 438 N.Y.S.2d at 646; *see also Baker v. St. Agnes Hospital*, 70 A.D.2d 400, 421 N.Y.S.2d 81, 85 (2nd Dep't 1979) (it is the obligation of a drug manufacturer to "keep abreast of

knowledge of its products as gained through research, adverse reaction reports, scientific literature and other available methods," and to warn the medical profession); *Wolfgruber v. Upjohn Co.*, 72 A.D.2d 59, 423 N.Y.S.2d 95, 97 (4th Dep't 1979), *aff'd*, 52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980) (manufacturer must notify the medical community as to those risks which manufacturer has, or in the exercise of due diligence, should have knowledge).

tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.

*T.J. Hooper*, 60 F.2d at 740 (citations omitted).

■ Defendants challenge neither the applicability of the foregoing principles of law to the facts of this case nor Judge Nickerson's instructions to the jury setting them forth. Rather, Celotex argues that the Hemeon Report is irrelevant to the issue of liability because, since the company never saw the report, it could not have been on notice of the information contained therein. Furthermore, Celotex contends that because the report was not published, it was not part of the state of the art. These arguments miss the point. The state of the art, as embodied in Judge Nickerson's jury instructions, was defined in terms of whether the dangers of asbestos were reasonably foreseeable or scientifically discoverable at the time of plaintiff's exposure. "The actual knowledge of the individual manufacturer is not the issue." *Dartez v. Fibreboard Corp.*, 765 F.2d 456, 461 (5th Cir.1985).

At trial, Celotex defended on the ground that it reasonably thought plaintiff's workplace to be safe since it operated its facilities below the threshold limit value ("TLV") which established a presumably safe level of exposure to asbestos dust of five million particles per cubic foot of air. Operation of a plant at this TLV was, Celotex maintains, the so-called "state of the art" since that TLV had been recommended by the American Conference of Governmental Industrial Hygienists ("ACGIH") in 1946 and was based upon the conclusions of a 1938 study of asbestos workers published by the United States Government known as the Dreesen Study. Celotex argued to the jury, both in opening and in summation, that in the context of the ACGIH recommendation, the dangers of relatively low levels of asbestos exposure, such as those experienced by the plaintiff, were both unknown and unknowable by Philip Carey during the relevant period of

plaintiff's exposure to Philip Carey's asbestos products.

It was in this context that plaintiff offered and the court received in evidence the unpublished July, 1947 report containing a study of asbestos plants that was prepared by W.C.L. Hemeon, the head engineer of the Industrial Hygiene Foundation of America ("IHF"), for the Asbestos Textile Institute ("ATI"). The Hemeon Report expressed doubts as to the safety of the five million particle TLV. It explained that "scientific evidence is obscure" on the point and questioned "present dust count methods." Hemeon recommended "that studies be initiated aimed to develop another yardstick." Philip Carey was not a member of the Asbestos Textile Institute, to whose members the report was distributed, and there was no evidence presented that anyone at Philip Carey was aware of the Hemeon Report during the relevant period.

■ The document was relevant in plaintiff's direct case not to show what Celotex knew, or even what manufacturers knew generally, but what, if the jury so determined, Celotex reasonably should have known had it either conducted its own tests or been in contact with others in the industry, such as IHF or ATI, that were testing. The relevance of the Hemeon Report was elevated by Celotex's reliance at trial on the five million particle TLV recommended in 1946 by ACGIH that Hemeon then criticized the following year in his report. Judge Nickerson plainly did not abuse his discretion in finding the Hemeon Report relevant.

*Bolm v. Triumph Corp.*, 71 A.D.2d 429, 422 N.Y.S.2d 969 (3rd Dep't 1980), upon which the defendant relies, is distinguishable. There the court excluded evidence of post accident studies and safety tests employing methodology that had not been developed at the time an allegedly defective motorcycle was manufactured. The court deemed the evidence inadmissible because the plaintiff had not established that the post accident tests were within the state of the art at the time of manufacture. The Appellate Division found error in the trial court's admission of the evidence on the

ground that the tests were "technically" or "ultimately" possible at the time of manufacture. *Bolm*, 422 N.Y.S.2d at 975, 71 A.D.2d 429. By contrast, the information contained in the Hemeon Report was not only "technically" or "ultimately" possible during the relevant time period, but was in fact set forth in a report that existed at that time. Judge Nickerson, therefore, correctly left it to the jury to decide whether Celotex reasonably should have known of the information comprising the contents of the report, not of this one specific report itself.

■ Celotex next claims that even if the report is relevant, it was improperly admitted as it is hearsay not within any of the exceptions to the hearsay rule. In response, plaintiff first argues that the report was admitted "not for the truth or falsity of its suggestion that the TLV was improper ... but merely to show that someone said it was wrong in 1947" and, thus, plaintiff argues, it is not hearsay. To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay. *See Gardner v. Q.H.S. Inc.*, 448 F.2d 238, 244 (4th Cir.1971); *Webb v. Fuller Brush Co.*, 378 F.2d 500, 502 (3rd Cir.1967); *Emich Motors Corp. v. General Motors Corp.*, 181 F.2d 70, 82 (7th Cir.1950); *remanded on other grounds*, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (citing *Greater New York Live Poultry, etc. v. U.S.*, 47 F.2d 156, *cert. denied* 283 U.S. 837, 51 S.Ct. 486, 75 L.Ed. 1448 (1931)). But if this basis were the only one upon which the report could have been offered, its receipt would have been improper. Philip Carey could not have been put on notice by the Hemeon Report because there was no proof at trial that Philip Carey ever saw the unpublished report or that it reasonably should have seen it as part of the published literature in the industry. Celotex is quite correct that before plaintiff can argue non-hearsay notice

she must show that the defendant was at least inferentially put on notice by the report. This plaintiff has not done.

Plaintiff's better argument is that the Hemeon Report was hearsay as Celotex contends, but that it is nonetheless admissible under either of two exceptions to the hearsay rule—as a business record of the American Textile Institute or as an ancient document.

■ While we have some doubts as to whether the Hemeon report meets the requirements of Fed.R.Evid. 803(6) as a record of regularly conducted business activity, we need not decide that question because, in our view, the document is admissible as a statement in an ancient document pursuant to Fed.R.Evid. 803(16). The document had been in existence more than twenty years and its authenticity was established at trial as contemplated by the rule. Its authenticity was established in accordance with Fed.R.Evid. 901(b)(8).[2] Indeed, defendant does not dispute that plaintiff met these requisites for admitting the Hemeon Report as an ancient document. Rather, Celotex argues that the need to test the reliability of the report's conclusions makes it inadmissible as an ancient document. Defendant cites neither caselaw nor commentary in support of its argument, nor could we find any that limit the scope and application of the ancient documents exception to the hearsay rule in the manner suggested by the defendant. Accordingly, we conclude that the report was properly admitted as an ancient document pursuant to Fed.R.Evid. 803(16).

■ Finally, Judge Nickerson did not abuse his discretion in refusing to exclude the Hemeon Report pursuant to Fed.R. Evid. 403 which allows a court to exclude relevant, admissible evidence if its probative value is outweighed by the danger that

---

**2.** Rule 901(b)(8) provides that an ancient document may be authenticated by evidence that the document

    (A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a

place where it, if authentic, would likely be and (C) has been in existence 20 years or more at the time it is offered.

it will unfairly prejudice or confuse the jury. Because Rule 403 permits the exclusion of probative evidence, it is an extraordinary remedy that must be used sparingly. *Dartez*, 765 F.2d at 461. In this case, the Hemeon Report presented a more complete picture of the state of the art at the time of the plaintiff's exposure to asbestos. Any prejudice to Celotex was derived from the Hemeon Report's probative force and thus it did not *unfairly* prejudice Celotex. Accordingly, it was within the district court's discretion to admit it.

#### B. *Allocation of Liability*

Celotex also argues that the jury's allocation of 90% liability against Celotex was wholly unsupported by the evidence. Although the decedent was a Keasbey employee from 1931 until 1975, Celotex contends, Keasbey ceased distributing Carey products in 1965 and thereafter distributed only other manufacturer's products. Thus, Celotex reasons, the percentage responsibility attributed to Philip Carey could not exceed 78% as George was exposed to Philip Carey products for only 35 of the 45 years he worked for Keasbey.

In the first place, Celotex is factually in error. Testimony at trial indicated that the decedent retired in 1975 after 58, not 45, years of service with Keasbey during 48 of which Keasbey distributed Carey products. More significantly, however, the jury heard evidence that mesothelioma surfaces after a latency period of up to 40 years. Thus, the non-Philip Carey products to which George was exposed in the last nine years of his employment probably played little or no role in the disease process. The jury could reasonably have apportioned liability based on the percentage of Carey products handled by Keasbey in the 1930's and 1940's at a time when Keasbey was Philip Carey's exclusive distributor in the New York area and, as one witness testified, Keasbey handled "almost all Carey products." Thus, there was ample evidence to support the jury's apportionment of liability.

## CONCLUSION

For the reasons set forth above, the judgment of the district court is affirmed in all respects.