**RONDOUT VALLEY CENTRAL SCHOOL DISTRICT,**
Plaintiff,

v.

**THE CONECO CORPORATION,**
et al., Defendants.

No. CIV. 101CV1702LEKRFT.

United States District Court,
N.D. New York.

June 14, 2004.

Raymond G. Kuntz, Office of Raymond G. Kuntz, Bedford, NY, for Plaintiff.

Robert S. McEwan, Jr., Nixon, Peabody Law Firm, Albany, NY, for Defendants.

### ORDER

TREECE, United States Magistrate Judge.

The Defendants jointly seek a Motion *in Limine*, pursuant to FED. R. CIV. P. 26, and FED. R. EVID. 402, 702, and 802, to preclude the Plaintiff's expert testimony at trial. Defendants attack Plaintiff's expert and his testimony on several grounds: (1) this expert is not qualified to serve as an expert in this action; (2) Plaintiff's expert's report and testimony are not sufficiently reliable to be admitted at trial; and (3) the

expert and his report will not assist the trier of fact.

Based upon the reasoning below, the Defendants' Motion is **denied**.[1]

## I. FACTUAL HISTORY

In 1995, the Plaintiff desired to pursue a significant energy conservation project for the entire school district and retained The Conservation Group (TCG), an energy project, to assist in implementing an energy management system. Amongst multiple conservation measures, the Plaintiff contemplated the installation of cogeneration units in the Roundout Valley High and Middle Schools. In 1996, TCG entered into a joint venture with Defendant Coneco as its implementation partner. Dkt. No. 36, Ex. 5 (Joint Venture Agreement). Coneco is a wholly owned subsidiary of Defendant Boston Edison Company and its affiliates are N'Star, BEC Energy, Commonwealth Energy System, BEC NewCo, Inc., and Boston Edison Technology Group, Inc., who are all Defendants in this case. Eventually, on or about June 11, 1997, the parties entered into the Guaranteed Savings Energy Management Agreement (GSEMA). Dkt. No. 37, Ex. 1 (GSEMA Agreement). Under this comprehensive energy contract, in addition to installing cogenerations units, the Defendants agreed to remove and replace boilers, per-

---

1. During the course of this Motion, the Northern District of New York converted from a manual, paper service and filing of motions to an electronic filing of said documents. *See* General Order 22 (setting forth administrative procedures for electronic case filing). Such conversion caused confusion for the parties and, thus, the parties respective Motions and pleading were recorded on the docket more than once and were unwittingly assigned multiple docket numbers. The following is a proper rendition of the parties' respective pleadings and exhibits as they may pertain to this Motion.

For the Defendants:

| Dkt. Nos. | | |
|---|---|---|
| 22/47 | | Notice of Motion *in Limine* |
| 23/48 | | Robert S. McEwan, Jr. Esq., Aff. |
| 25/49 | | Exs. A–F |
| 24 | | Mem. of Law |
| 51 | | Reply Memorandum of Law |

For the Plaintiff:

| Dkt. Nos. | | |
|---|---|---|
| 35 | | George Sansoucy Aff. (Expert) |
| 36 | | Leah L. Murphy, Esq., Aff. |
| 37 | | Exs. 1–20 |
| 38 | | Mem. of Law |

form asbestos abatement, install hot water heaters and storage tanks, install new roofs, and perform maintenance of these items various terms ranging from a five to fifteen years. *Id.* Defendants performed many of these construction obligations and installations, though the adequacy of such performance and installation are in dispute.

The Plaintiff claims that the Defendants breached the GSEMA. Among other things, the Plaintiff alleges: (1) the cogeneration units are inoperable; (2) Defendants abandoned their warranty and maintenance obligations, forcing the Plaintiff to hire a third party to maintain the system; (3) Defendants abandoned the maintenance warranty and annual preventive maintenance on the installed roofs; (4) Defendants failed to properly retrofit the HVAC units and abandoned the respective warranties and maintenance thereof; (5) the installed hot water heaters were defective and had to be replaced; and (6) due to Defendants' failure to honor its management and monitoring responsibilities and the failure of the cogeneration units, the Plaintiff is unable to realize the energy savings guaranteed in the GSEMA. Plaintiff further charges that shortly after the installation of the energy conservation measures, in January 1999, Coneco was dissolved by Boston Edison Company and thereafter abandoned its obligation to the Plaintiff under this agreement. To reiterate, some aspects of the agreement had fifteen year warranty and maintenance obligation. Dkt. No. 35, Leah L. Murphy, Esq., Aff; Dkt. No. 23/48, Robert S. McEwan, Jr., Esq., Aff. Because, as the Plaintiff claims, the cogeneration facility is inoperable and the Defendants abandoned the warranty and maintenance obligations set forth in the GSEMA, the Plaintiff was forced to contract with third-parties to fulfill these obligations. Dkt. No. 35 at ¶¶ 14 & 19.

The Plaintiff commenced this action on November 7, 2001, alleging seven causes of actions, all essentially based upon a breach of contract, and seeking general and consequential damages. Dkt. No. 1, Compl. The Defendants have answered the Complaint and filed counterclaims. Dkt. No. 4, Ans.[2]

The Plaintiff hired George Sansoucy, a licensed professional civil engineer (PE) from New Hampshire, to provide an expert opinion in this case with regard to the extent of damages sustained. Furthermore, Mr. Sansoucy would provide an explanation of the construction, design and energy conservation measures contemplated by the GSEMA, yet allegedly breached by the Defendants performance or lack thereof. Dkt. No. 35 at ¶¶ 35 & 36. The Plaintiff's expert's report was issued in September 2003 (Dkt. No. 25/49, Ex. B), and Mr. Sansoucy was deposed on October 28, 2003 (Dkt. No. 25/49, Ex. C). Notwithstanding the pending Motion and Cross Motion for Summary Judgment, this matter is, for the most part, ready for a bench trial. *See infra* n.2.

## II. DISCUSSION

### A. Expert Testimony

As stated above, Defendants have filed a Motion challenging Mr. Sanscoucy's qualifications to serve as an expert in this case, the relevance of his opinion and the reliability of his methodology in arriving at his opinion, the reliability of his testimony as a whole, and the lack of value of such testimony in that his testimony would not assist a trier of fact in understanding the evidence or in determining a fact in issue.

2. Currently pending before United States District Judge Lawrence Kahn are a Motion and Cross Motion for Summary Judgment. *See* Dkt. Nos. 26, 40–46, & 51–62.

■ The admissibility of expert testimony is govern by FED. R. EVID. 702, which reads as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This Rule can be distilled further into two major components: (1) the witness must be qualified as an expert in either scientific, technical, or specialized matters, and (2) the expert's testimony must be able to assist the trier of the facts. *See United States v. One Parcel of Property Located at 31–33 Yonkers Street,* 930 F.2d 139, 141 (2d Cir.1991).

■ The district court is the "gatekeeper" for such preliminary assessment such as determining whether the expert testimony is scientifically valid, has a reliability foundation, whether the methodology can be applied to the facts of the case, and is relevant to the task at hand. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 582, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *McCullock v. H.B. Fuller Co.,*

61 F.3d 1038, 1042 (2d Cir.1995). The trial court has always had broad latitude over the admission of evidence and it has been particularly broadened with respect to the admissibility or exclusion of expert evidence. *Bic Corp. v. Far Eastern Source Corp.,* 23 Fed.Appx. 36, 38, 2001 WL 1230706, *1 (2d Cir.2001) (citing *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)); *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038.[3] This principle of broad discretion is never more evident where the court has to determine if the expert testimony will be helpful to the fact finder. *Bic Corp.,* 23 Fed.Appx. at 38. In this respect, "[t]he trial court's view of helpfulness is entitled to deference." *Id.* (citing *George v. Celotex Corp.,* 914 F.2d 26, 28 (2d Cir.1990) ("District court's determination of relevance will not be disturbed unless it evidences an abuse of discretion.")). Such deference is particularly profound with respect to bench trials because the trial court is "presumed to be able to exclude improper inferences from his or her own decisional analysis." *Id.* at 39; *see also Schultz v. Butcher,* 24 F.3d 626, 631–32 (4th Cir.1994) ("For a bench trial, we are confident that the district court can hear relevant evidence, weigh its probative value and reject any improper inferences."); 11 CHARLES A. WRIGHT & ARTUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2885 (2d ed.

---

3. The *Bic* Court also observed that,

[a]lthough expert testimony may be excluded if it is speculative or conjectural, *see In re Air Disaster at Lockerbie Scotland,* 37 F.3d 804, 824 (2d Cir.1994), *cert. denied,* 513 U.S. 1126, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995), or if it is based on assumptions that are "so unrealistic and contradictory as to suggest bad faith" or to be in essence an " 'apples and oranges' comparison," *Shatkin v. McDonnell Douglas Corp.,* 727 F.2d 202, 208 (2d Cir.1984), other contentions that the assumptions are unfounded

"go to the weight, not the admissibility, of the testimony," *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1188 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

*Bic Corp. v. Far Eastern Source Corp.,* 23 Fed.Appx. at 38, 2001 WL 1230706,at *1. Furthermore, the Court is aware that citing to an unpublished decision such as this may not, in all instances, be proper, yet, we find this case to be an excellent recitation of established law and would be helpful to the reader.

1995) ("In non jury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence."). In the final analysis, especially considering the "presumption of admissibility of evidence," the utility of an expert's testimony should be "resolved in favor of admissibility." *TC Sys. Inc. v. Town of Colonie, New York*, 213 F.Supp.2d 171, 174 (N.D.N.Y.2002) (citing *Marmol v. Biro Mfg. Co.*, 1997 WL 88854, at *4 (E.D.N.Y. Feb.24, 1997)); *see also* FED. R. EVID. 702, Advisory Committee Notes (2000 Amend.) (after conducting a survey of the cases after *Daubert*, concluded that rejection of expert testimony is the "exception rather than the rule").

### B. Qualification

■ As stated above, FED. R. EVID. 702 permits opinion testimony if a witness qualifies as an expert by "knowledge, skill, experience, training, or education." Generally speaking, expert qualifications are liberally construed. *United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985); *Canino v. HRP, Inc.*, 105 F.Supp.2d 21, 27 (N.D.N.Y.2000) ("[L]iberality and flexibility in evaluating qualifications should be the rule..." (citations omitted)). To determine whether a witness is qualified to rendered an opinion in a particular case,

> the court must first ascertain whether the proffered expert has the educational background or training in a relevant field. Then the court " 'should further compare the expert's area of expertise with the particular opinion the expert seeks to offer [and permit t]he expert ... to testify only if the expert's particular expertise ... enables the expert to give an opinion that is capable of assisting the trier of fact.' " *Zwillinger [v. Garfield Slope Housing Corp.]*, 1998 WL 623589, at *7 [ (E.D.N.Y. Aug. 17, 1998) ] (quoting Federal Judiciary Cen-

ter, Reference Manual on Scientific Evidence 55–56 (1994)). *TC Sys. Inc. v. Town of Colonie, New York*, 213 F.Supp.2d at 174 (omissions and alterations in original).

As aforesaid, the Plaintiff retained George Sansoucy, P.E., to testify at trial as to damages and to further provide explanation on the construction, design and the energy measures associated with the GSEMA. Dkt. No. 35 at ¶¶ 36 & 37. Mr. Sansoucy has both a bachelor's and master's degree in civil engineering and is a licensed professional engineer in New Hampshire. He is the principal owner of an engineering firm that specializes in consulting and valuation of construction and engineering services. As his resume reflects, he has extensive experience in "either the design, construction, and/or valuation of small or large electric generating plants, and has consulted on massive power plants to cogenerating devices." *Id.* at ¶¶ 2 & 3 (resume attached); Dkt. No. 25, Ex. D. Moreover, he has testified often on the use of electrical generating, although he conceded at his depositions that he had not been previously involved in the types of cogeneration system installed by Defendant Coneco. Dkt. Nos. 35 & Dkt. No. 25/49, Ex. C (Sansoucy's Deposition). The Plaintiff has proffered Sansoucy's background and experience as particularly suitable to provide testimony on how energy management systems are to be installed, function, and the amount of damages. Dkt. No. 36 at ¶ 37.

Defendants assert that Sansoucy is not qualified to provide expert testimony in this matter. Their arguments are made in the alternative. One, they argue that Sansoucy's qualifications are narrowly confined to real estate and "facility valuation" to the exclusion of the requisite expertise needed in this particular type of case. Defendants point out that Sansoucy has never

actually constructed a similar energy management system, designed a cogeneration facility much like the one in issue in this case, provided boiler maintenance, and, accordingly, should be precluded on these accounts. It follows then, therefore, his limited experience in such matters would not make him an expert to address the issues at bar. In the alternative, Defendants highlight the fact that Sansoucy professes to have wide range engineering expertise which includes, but is not limited to: cost appraisals and valuations; construction series; engineering design of roads, buildings, foundations, utilities and controls; development of hydroelectric projects; development of water and wastewater treatment facilities; performance of environmental assessment; performance of dam, canal and waterway renovations; and hazardous waste evaluation. By having such a wide range of expertise, the Defendants contend that he could not be an expert appropriate for a case such as this but, rather, he is nothing more than just a hired gun. Dkt. No. 24, Mem. of Law, Point III. (citing *Tokio Marine and Fire Ins. Co. Ltd. v. Grove Mfg. Co.*, 958 F.2d 1169, 1175 (1st Cir.1992)). Much of his experience or expertise, the Defendants surmise, clearly are not able to address the engineering elements relevant to this case.

 Even if the Defendants' contentions were accepted at face value, the "lack of extensive practical experience directly on point does not necessarily preclude [an] expert from testifying." *TC Sys.*, 213 F.Supp.2d at 174 (quoting *Valentin v. New York City*, 1999 WL 33323099, at *15 (E.D.N.Y. Sept. 9, 1997)) (alteration in the original). As Sansoucy concedes, in some limited respect, he may not be the quintessential expert in the narrow, esoteric field of developing cogeneration systems for school system. Yet, he does draw our attention to his overall experience with such principles, construction thereof, and the valuation of such types of systems. That experience and knowledge includes cogeneration devices and integral components thereof, such as electric generating plants and electrical generator. His education and experience are sufficient enough to provide an opinion in this case and, in our assessment, he is qualified to the extent of being able to educate a factfinder about such broad design, construction, maintenance, and economic principles and forces, and the interplay among these principles as they may be relevant to this case. An expert's opinion and tutelage of the court is well embedded within the prescription of FED. R. EVID. 702. As long as the expert has experience to support his opinion, explains how such experience leads to the expert's conclusion and demonstrates how the experience is reliably applied to the facts at hand, he should not be required to satisfy an overly narrow and rigid test in order to be considered an expert in a case such as this. *Henry v. Champlain Enter., Inc.*, 288 F.Supp.2d 202, 220 (N.D.N.Y.2003). Rather than relying upon rigidity, demanding that an expert's qualifications match perfectly with the issues at hand, liberality and flexibility in evaluating qualifications should be the court's guide. *Id.* Basically then, a proffered expert who has the minimum level of education and relevant experience in the field should not be precluded from testifying. *Id.* Therefore, Defendants' challenges to Sansoucy's qualifications are better addressed during the heat of cross examination. *Id.* (citing *Canino v. HRP, Inc.*, 105 F.Supp.2d at 27–28 ("The Second Circuit has held that 'quibble[s] with [a] proposed expert's training or knowledge on specific points' may be properly explored on cross examination at trial.")); *TC Sys.*, 213 F.Supp.2d at 175 (citing, *inter alia, Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir.

1990) ("The fact that a witness's qualifications are not unassailable, does not mean the witness is incompetent to testify; [r]ather 'it is ... for the jury with the assistance of vigorous cross-examination, to measure the worth of the opinion[s]." ")) (alteration omissions in original).

Continuing in the same vein, Defendants assail Sansoucy's qualifications by raising a bevy of cases in which various courts rejected Sansoucy's testimony thereby suggesting that he is not a reliable witness in this case either. In defense of his expertise, Sansoucy counters with an equal number of cases in which his opinion testimony was accepted. There is no need for us to debate herein the merit, or lack thereof, of each of the two dozen or so cases provided to this Court that analyzed Sansoucy's testimony, or weigh on a scale the relative balance of rejections versus acceptances, except to note, that those cases that rejected his testimony did not do so based upon Sansoucy's lack of qualification, but rather based their disapproval upon either the underlying methodology of his conclusion or the conclusion itself. Those prior cases do not strike at the heart of the admissibility of Sansoucy's report in this case. They may however have a bearing on the weight or credibility to be given to the report and the testimony. If relevant to the present case, those previous cases that questioned his diligence, methodology, calculations, and principles may indeed be fertile bases for a vigorous cross examination.

## C. Reliability of the Expert's Testimony

Next, Defendants attack Sansoucy's report and testimony by claiming unreliability. Here again, the Defendants have a long list of objections to both the report and the testimony but, in a nutshell, they contend that: (1) there is no expert opinion provided but rather a restatement of the facts, a recalculation of invoices, and no such measure of expertise is involved; (2) the expert testimony is nothing more than "mirroring" evidence already obtained and, thus, cumulative in nature; (3) such opinion cannot withstand rigorous or intellectual standards; and (4) this expert is not able to testify from personal knowledge nor through independent studies and is unable to establish the underlying costs and premises as reliable.

It is incumbent upon the trial judge, when faced with the proffer of expert testimony, to

> determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[4]

---

**4.** The thrust of *Daubert* was to confirm that the "general acceptance" standard (commonly known as the *Frye* Test) employed to review scientific testimony established by *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (D.C.Cir.1923) was superseded by amendment to FED R. EVID. 702. The rigidity of the "general acceptance" standard is an anathema to the "liberal thrust" of the Federal Rules and the Supreme Court made evidently clear

that a far more relaxed approach would be used to weigh expert testimony. *Id.* at 588–89, 113 S.Ct. 2786. Therefore, since the "general acceptance" standard is no longer a precondition to the admissibility of scientific evidence, it has been replaced with a fundamentally more flexible analysis. *Id.* at 597, 113 S.Ct. 2786.

The Court also observed,

To be certain then, the trial court must ensure that, before any scientific or expert testimony is admitted into evidence or presented to the factfinder, such testimony "rests upon a reliable foundation and is relevant to the task at hand." *Id.* at 597, 113 S.Ct. 2786. In doing so, the trial court must focus on the methodology used to draw the expert's conclusion and not the conclusion itself. *Id.* at 590, 113 S.Ct. 2786. In order to evaluate the scientific methodology, the Supreme Court enunciated several non-exclusive factors to be considered:

(1) whether the expert's conclusions have been tested or are testable; (2) whether the expert's conclusions have been published and subjected to peer review; (3) whether the scientific technique has a potential or known error rate; and (4) whether the expert's conclusions have gained general acceptance within the scientific community.

*TC Sys.,* 213 F.Supp.2d at 175–76 (citing *Daubert,* at 593–94, 113 S.Ct. 2786).

These factors are not the *sine qua non* or meant to be definitive but only helpful and instructive. *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 151, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Indeed, "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his [or her] testimony." *Id.* at

150, 119 S.Ct. 1167 (quoted in *TC Sys.,* 213 F.Supp.2d at 176).

The crux of Sansoucy's expert report is the calculation of the present and future damages due to the Defendants' alleged breaches of the contract. Essentially, Sansoucy's report and prospective testimony is akin to an economist's report, with the exception of Sansoucy considering relevant engineering, construction, and maintenance factors associated with the GSEMA and this lawsuit. Dkt. No. 25/49, Ex. B. And to the degree that Sansoucy is viewed in the context of an economist or cost evaluator, it is axiomatic that an economist, by virtue of his education and training, would be qualified to educate the factfinder about such broad economic principle and market forces. *TC Sys.,* 213 F.Supp.2d at 175. The same would hold true for Sansoucy on engineering and construction principles.

Sansoucy's copious report is broken into components which address each of the alleged breaches of contract.[5] Within those components are elaborate charts that display how Sansoucy calculated the respective damages for that purported breach of the contract. In Part I, Introduction, Section E of the report, Sansoucy summarizes the methodology to those calculations:

Where there are expenses paid through purchase orders and/or invoices, the transaction detail is summarized. Inter-

---

We are confident that federal judges possess the capacity to undertake this review. Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate.

*Id.* at 593, 113 S.Ct. 2786.

**5.** The components of Sansoucy's report are listed as follows: I. Introduction and Background; II. Heating Equipment and Boilers; III. Co–Generation Equipment; IV. Energy Management System (Digital Control System); V. Lighting Systems; VI. Ventilation;

VII. Guaranteed Energy Savings pursuant to the terms of GSEMA; and VIII Roofs. Each component contains an analysis specifically related to that particular aspect of the contract, which includes what was expected pursuant to the terms of the GSEMA, the purported breach of the contract by the Defendants, any costs and expenses incurred due to the alleged breach of the contract, and, if there is a future consequence due to the purported breach, a calculation of those future damages.

est is calculated based on an annual percentage rate of nine (9%) percent, which we have been advised by counsel is the statutory rate applicable to such transactions in New York, from the date of payment to September 1, 2003, the approximate date of this report. Future damages are projected to increase at a general inflation rate of 3.0%. The value of these damages is the amount of money that, if invested in an annuity-type vehicle, would provide the necessary cash to pay the expenses in the calendar or fiscal year in which they come due. Because it is a governmental unit, the District has a fiduciary responsibility to invest conservatively. Therefore we have selected an investment rate of 4.5%, which is the August 21, 2003, Federal reserve 10–year constant maturity rate. The total future damages for each year are discounted by a factor based on this rate to determine the present value of the damages on the date of this report.

Dkt. No. 25/49, Ex. B at pp. 8 & 9.

Without doubt, this methodology is the same as those employed by economists and should be evaluated within that framework. Defendants would like this Court to conduct an analysis of Sansoucy's methodology based upon scientific evaluation and strictly employ those evaluative factors enunciated in *Daubert*. We reject Defendants' entreaty because such standard is not applicable.

In determining the admissibility of a report such as this, a court **may** consider one or more of the factors suggested in *Daubert*, but does not necessarily have to follow to the letter the *Daubert* paradigm. *Kumho Tire*, 526 U.S. at 149–50, 119 S.Ct. 1167. In many cases, those proposed factors may not be relevant as to technical or specialized principles pertinent to the nature of the case, the expertise at hand, the facts of the case, and the subject of the

testimony. *Id.* at 150, 119 S.Ct. 1167. To the extent that those proposed factors constitute a reasonable measure of the reliability of the expert's testimony, then they should be considered. *Id.* at 152, 119 S.Ct. 1167. If they are otherwise inadequate, the court has broad latitude to consider other and similar factors in evaluating reliability and relevance of a particular discipline. *Id.* at 149, 152–53, 119 S.Ct. 1167. The main course then is that the courts apply flexibility when testing reliability. *Id.* at 141, 119 S.Ct. 1167.

This Court finds, whether employing the *Daubert* factors or other factors, Sansoucy's report reflects a reasonable modicum of reliability as a method of calculating present and future damages. The methodology set forth in Part I. Introduction, Section E of his report bears a remarkable resemblance to that of economists' reports and valuations, and, to be candid, there exists very little deviation from those standard economic valuation processes. We must remember that it is expected of this Court to weigh the reliability of methodology and not its ultimate conclusion. Defendants may disagree, *inter alia*, with some of the factors used by Sansoucy to calculate damages, such as the inflation and discount rates, but such matters are better left for cross examination rather than exclusion. "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the **weight, not the admissibility of his testimony.**" *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995) (citing in *Henry v. Champlain Enter., Inc.*, 288 F.Supp.2d at 221); *see also TC Sys.*, 213 F.Supp.2d at 176 (noting that the issues raised by the challenging party involve the weight that should be afforded the expert's testimony and not the methodology used in reaching the conclusion) (em-

phasis added). In sum, Defendants' numerous objections to Sansoucy's report and anticipated testimony do not address their admissibility and are better reserved for a factfinder's scrutiny. *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1188 (2d Cir.1992).[6]

▮ For the sake of further clarity, we will address several of the Defendants' specific objections to Sansoucy's report and testimony. We commence our analysis knowing that there is a presumption of admissibility of expert evidence. *TC Sys.,* 213 F.Supp.2d at 173–74 (citations omitted). The fact that Sansoucy relied upon invoices for cost and expenses incurred by the Plaintiff, the observations of others, and that all of this may mirror all other evidence is of little consequence. Sansoucy's report and testimony are much more than a recapitulation of those facts, and if it were true, we would agree with Defendants that its effect is cumulative. *United States v. Amuso,* 21 F.3d 1251, 1263–64 (2d Cir.1994) (expert testimony cannot mirror testimony offered by a fact witness or just recite the facts); *see also Pfeiffer v. Lewis County,* 308 F.Supp.2d 88, 96 (N.D.N.Y. 2004). Sansoucy's report is more than a quantitative analysis of the damages but may also be a qualitative analysis with a reliable basis supported by the requisite knowledge and discipline of a cost evaluator. As we noted before, a report of this type is not subject to rigorous scientific standards because such standards would be incorrectly applied. The same would be true with regard to peer review or empirical analysis. However, this report does withstand an intellectual scrutiny fitting for an economists and/or cost evaluator and we therefore reject Defendants' characterization that Sansoucy report is nothing more than a mere tally of invoice.

The fact the calculation of damages assumes an inflation and discount rates present a far more complicated view of damages than mere arithmetic.

▮ Defendants charge that Sansoucy has no personal knowledge upon which to base his opinions nor did he conduct any independent studies. In fact, Sansoucy collected most, if not all, of his data from various sources and relied upon some of the independent studies performed by Mr. Philip L. Munck, an associate of Sansoucy for eight years. Dkt. No. 35 at ¶¶ 6–11. Reliance upon these arguments will be to little avail. As the Second Circuit noted in *Tyler,* "[u]nder FED. R. EVID. 703, expert testimony may be based upon firsthand observation of the witness, on facts or data presented at trial, or on facts and data presented before the trial." *Tyler v. Bethlehem,* 958 F.2d at 1188. Nor do the facts and data relied upon by the expert need to be admissible in evidence for the opinion to be admitted. FED. R. EVID. 703. Thus, an expert does not have to conduct his own tests and may rely upon data that he did not personally collect. *Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 94–95 (2d Cir.2000) (citing FED. R. EVID. 703 and *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 524 (2d Cir.1996)); *see also United States v. Mulder,* 273 F.3d 91, 102 (2d Cir.2001) (finding that an expert can rely upon multiple hearsay if experts in the same field reasonably rely upon such evidence). Generally speaking, this is application employed by various types of expert and the rare exception to this experience is an expert who may have first hand knowledge. If these legal postulations were not so nor in place, and personal knowledge was required, an expert witness would have to be a fact witness, whose status would, in most re-

---

**6.** As an interesting aside, the courts in both *TC Systems* and *Henry v. Champlain Enter.,* *Inc.,* address the evaluation of economists' and/or valuation reports.

spects, limit the delivery of an opinion. Dkt. No. 35 at ¶ 16 ("Obviously, no expert can have first hand knowledge of every fact in the case. Otherwise, the expert witness would more properly be a fact witness."). What Sanscoucy has done in performing his investigation with the goal of providing an opinion falls squarely within the normal and expected course of an expert witness.

■ Defendants raise the alarm that Sansoucy is attempting to render legal conclusions in his report, which Sansoucy vigorously denies. *See* Dkt. No. 35 at ¶ 19. Our view of the report does not support the contention that Sansoucy may be rendering legal conclusions but, in order to render his opinion, he has presumed that the proof will establish that the Defendants did in fact breach many provisions of the GSEMA. Often the distinction between fact and legal conclusion is blurred. *TC Sys.*, 213 F.Supp.2d at 181–82. However, to make it abundantly clear for the parties, it is axiomatic that an expert is not permitted to provide legal opinions, legal conclusions, or interpret legal terms;

those roles fall solely within the province of the court. *Hygh v. Jacobs*, 961 F.2d 359, 363–64 (2d Cir.1992) (citing *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509–10 (2d Cir.1977)); *see also TC Sys.*, 213 F.Supp.2d at 181 ("It is well established within this Circuit that expert testimony cannot 'usurp the role of the trial judge in instructing the [factfinder] as to the applicable law' . . . . [and] may not give testimony stating ultimate legal conclusions based upon the facts.") (citing, *inter alia, United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991)).

All of these concerns being raised by the Defendants should not generate any alarm. It should not escape us that this is a bench trial. A trial judge is quite capable to discern the relevant evidence, weigh the probative value or its prejudicial effect, and readily reject an improper inference or intrusion upon its role.[7] *Bic Corp.*, 23 Fed.Appx at 39; *Henry v. Champlain Enter. Inc.*, 288 F.Supp.2d at 221 (a trial court should be able to separate the "wheat from the chaff."); *see also* FED. R.

---

7. In this same context, Defendants raise that Sansoucy may have exceeded the scope of his report in both his deposition (Dkt. No. 25/49, Ex. C) and his affidavit in opposition to this Motion. We are unable to determine precisely at what juncture of the deposition Sancoucy may have exceeded the scope of his findings. If he did exceed the scope of his report, the blame lies with the Defendants who were interrogating him and not Sansoucy. It would be their inquiry that could have provoked a response to which they now claim to be excessive; isn't this unwittingly "opening the proverbial door," something all interrogators much cautiously eschew. But in the scheme of things, isn't that the purpose of a deposition, that is, to inquire more thoroughly into the underlying opinions and premises of the report? And yet, when pursued there is a peril making such an inquiry, that maybe an unwelcome extrapolation upon the opinions could occur. Furthermore, the expert is not limited to the four corners of the report especially when the Defendants have availed

themselves of the opportunity to finitely peer within the expert's thought processes, methodology, factual basis, and the conclusions. As such, this deposition, considering the proscription of Federal Rules, may be coalesced with Sansoucy's report

Similarly, the Court is unable to determine how Sansoucy has added further issues in his affidavit. Dkt. No. 35. His affidavit, in the Court's view, is a further elaboration on his purpose, methodology, conclusions, and a defense against the strenuous attack on his professionalism. The affidavit, essentially, is nothing more than an extension or an expansion of his October 28, 2003 Deposition.

Yet, with all of this being said, in the final analysis, the trial judge, who is the factfinder, will be able to determine what is safely within the framework of Sansoucy's report, what Defendants clearly have notice with regard to the expert evidence, and what should be accepted into evidence.

 

EVID. 403. Knowing that the legal interpretation of this contract will fall within the capable hands of the trial judge should eliminate any fears of misconstruction or misapplication of the pertinent law. This does not mean however, that the calculation of present and future damages, by this expert, cannot be based upon the plain language of the contract.

### D. Assist the Trier of Fact

■ Lastly, the Defendants assert that testimony to be provided by this expert are well within the ken of the factfinder, obviating the need for such testimony. All that Sansoucy has done, in the Defendants' view, in this "simple breach of contract" case is regurgitate the facts which will be testified by others. This Court respectfully disagrees with the Defendants' assessment and finds that Sansoucy's testimony may assist the trier of fact to understand the issues of cogeneration systems, construction and design, maintenance, and the calculation of future damages. All of these issues are not within the ken of the factfinder and it may be extremely helpful if an expert guides the factfinder through the maze of highly technical and complicated information and provide an in-depth calculation of present and future damages. "The [ ] court's view of helpfulness [to the factfinder] is entitled to deference, unless there is an abuse of discretion." *Bic Corp.*, 23 Fed.Appx at 38. Without the real benefit of cross examination at this juncture, the Court finds Sansoucy's expertise and conclusion extremely persuasive in almost every account, and the factfinder may find similarly. The factfinder should not be denied such evidence nor the opportunity to weigh the credibility and the value of such testimony.

### III. CONCLUSION

Based upon all of the foregoing, the Defendants' Motion is **denied.** Mr. Sansou-

cy shall be permitted to provide expert testimony to the trier of fact, that being, the District Judge himself, with the exception that Sansoucy shall not be permitted to testify as to any legal conclusion as they may pertain to this GSEMA.

SO ORDERED.