Frankson v Brown & Williamson Tobacco Corp. (2004 NY Slip Op 50605(U))

[*1]

Frankson v Brown & Williamson Tobacco Corp.

2004 NY Slip Op 50605(U)

Decided on June 22, 2004

Supreme Court, Kings County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 22, 2004

Supreme Court, Kings County
GLADYS FRANKSON, as Administratrix of the Estate of HARRY WILLIAM FRANKSON, and GLADYS FRANKSON, Individually, Plaintiffs,
against
BROWN & WILLIAMSON TOBACCO CORPORATION, Individually and as Successor by Merger to the AMERICAN TOBACCO COMPANY, THE TOBACCO INSTITUTE, INC. and THE COUNCIL FOR TOBACCO RESEARCH-USA, INC., Defendant.
24915/00

Herbert Kramer, J.
Can cigarette manufacturers present a state of the art defense via documents lacking in scientific integrity?
In 1954, The American Tobacco Company solicited off-the-cuff opinions from well known scientists condemning studies which tended to link smoking with cancer. Indeed, during this trial, all of the parties attempted to re-litigate the smoking and health controversy of the nineteen fifties by offering opinions contained in articles, letters, editorials, ancient documents and the like which were so voluminous that they threatened to swell into a confusing, unreliable torrent of information, which, if left unchecked, would have inundated this jury. Thus this Court , in the exercise of its gate keeping function, created a standard against which all such evidence would be tested in order to prevent this untenable result. [FN1]
 To demonstrate that in the early fifties the American Tobacco Company reasonably believed that smoking was not harmful, defense counsel sought, inter alia, to introduce a document called the "Brooks Memo". This document was prepared by a consultant to the American Tobacco Company, who summarized the opinions he collected from certain scientists regarding smoking and health issues.[FN2] The main thrust of defendants' arguments with respect to [*2]the admissibility of this document was that the quotations in the document came from very distinguished scientists in the field, upon whose opinion the defendant's were entitled to rely.
This evidence was offered as "state of the art evidence which is properly admissible to establish that a product is not defective and unreasonably dangerous because of a failure to warn . . . of dangers that were . . . [not] known to [the manufacturer] or knowable in light of the generally recognized and prevailing scientific and technical knowledge available at the time of the manufacture and distribution." Fireboard Corp. V. Fenton, 845 P.2d 1168, 1172(Colo. 1993). The admission of state of the art evidence must be weighed, however, in light of the standard of knowledge attributable to a manufacturer which is that of an "expert in [the] field . . . [who has] a duty 'to keep abreast of scientific knowledge, discoveries and advances and . . . '[is] under a duty to make tests to ascertain the nature of [its] product[s]. In this scientific age the manufacturer undoubtedly has or should have superior knowledge of his product.' In addition, a manufacturer has a duty to test fully and inspect its products to uncover all dangers that are scientifically discoverable." George v. Celotex Corp., 914 F.2d 26, 28(2d Cir. 1990)(citations and internal parenthesis omitted).
 "In fulfilling its duty, a manufacturer may not rest content with industry practice, for the industry may be lagging behind in its knowledge about a product, or in what, with the exercise of reasonable care, is knowable about a product . . . 'a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." George v. Celotex Corp., 914 F.2d 26, 28-29 (2d Cir. 1990) quoting Judge Learned Hand in T.J. Hooper, 60 F.2d 737, 740(2d Cir. 1932).
 Thus although the defendants were not trying to show that the statements in this document were true, they were trying to show that the manufacturers accepted them as being truthful and accurate. Accordingly, this Court holds that in order to demonstrate that their reliance upon these "distinguished scientists" was reasonable, the defense could not simply claim that the scientists were brilliant or highly regarded, but would have to show that their work had been tested, peer reviewed and published in peer-reviewed journals. See Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 590-591 (1993).[FN3]
[*3]
This standard is particularly important in this case and with respect to the defendants' proffer of evidence because, as manufacturers, they were in the best position to eliminate whatever dangers might be present in their products and consequently are expected to conduct themselves like experts in their field, Micallef v. Miehle Co., 39 N.Y.2d 376, 387(1976). The manufacturers are thus obligated to rely upon well founded information. Consequently, at trial, it behooved them to establish that their information was based upon solid, peer reviewed science rather than "off the cuff" surmises, though the "cuffs" may have adorned some distinguished wrists.
The defendants' motion for a new trial is denied. [FN4]
This constitutes the decision and order of the Court.
J.S.C.
Footnotes

Footnote 1:To the extent that questions arose in regard to the application of this standard, this Court offered to conduct a Frye [v. U.S., 293 F.1013(DC Cir. 1923) hearing an offer which was rejected by the defense

Footnote 2:. The following excerpts from the document are illustrative: The document quotes Drs. Harold L. Stewart and Harold C. Staffes as saying "Wynder, Graham and Ochener [who did studies on the effect of tars through mouse skin painting and inhalation tests] are evangelists. They are clinical men and know very little about the materials with which they work. They must, therefore, accept what their technicians say about them. . . . Dr. Paul Koton is probably on the right track in his study of smog constituents and lung cancer . . . . Only Dr. Steffee had seen any of Wynder's work - one slide of lung cancer. Dr. Steffee said it apparently was a carcinoma. One gets the impression that these workers are highly critical of Wynder's cancers. Dr. Harold Dorn is quoted as saying " About Wynder's results, I know what I have seen Wynder throw on the screen. 'Wynder's graphs are too perfect.' They are suspect - unreal." As to one Dr William G Hueper, the reporter states: "Dr. Hueper was not at NIH at the time, but a manuscript copy of an unpublished paper, made available to me, gives his opinion of the problem from the standpoint of occupational health . . . '(a)Skin application of Tobacco Tar; and (b) Inhalation of Tobacco Tar Fumes: 'A critical evaluation of the total experimental evidence permits the conclusion that tobacco tar obtained at various distillation ranges is of very weak if not doubtful carcinogenicity to the skin of mice and produces apparently only carcinomatoid tumors in the ears of rabbits, when applied over long periods of time." Similarly, the defendants' offered a letter that appeared in the British Medical Journal in 1955 calling media reports linking smoking and lung cancer "wild comments." 

Footnote 3: "The Frye decision distinguished . . . between the expert's education [and] his or her expertise [in] a specific subject matter. The body of knowledge upon which experts rely for their opinions must be separately evaluated from their professional education and training. If the underlying body of knowledge is not generally accepted by the professional community of that particular field, the testimony, regardless of the brilliance of the expert is inadmissible." Clemente v. Blumenberg, 183 Misc.2d 923, 929(Sup Court, Co., 1999).This Court is aware of the fact that the Daubert test has not been formally embraced by our Court of Appeals, however, it believes that it is within its discretion to apply it where, as here, the document contains the rankest of hearsay and its admission was sought on the ground that it provided a kind of "negative" notice to the defendants, that is, notice of the lack of a defect in their product, excusing their vigilance in correcting any flaws. 

Footnote 4: This is one of three decisions published contemporaneously which determine the motions for a new trial, for remitatur of the punitive damages verdict and for additur.