******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARY BETH FARRELL ET AL. *v.* JOHNSON
AND JOHNSON ET AL.
(SC 20225)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiffs, M and V, sought to recover damages from, among others, the
defendant H, a urogynecologist, for, inter alia, lack of informed consent
and innocent misrepresentation in connection with an unsuccessful
surgery in which H implanted a mesh product in M's body for the purpose
of treating M's pelvic organ prolapse. M experienced bleeding and pain
after the procedure, and, despite several follow-up procedures to allevi-
ate the pain and to remove the mesh product, her pain continued. M
subsequently was diagnosed with nerve damage. Prior to trial, the plain-
tiffs sought to introduce into evidence two articles from medical journals
containing certain statements regarding the limited data about the mesh
product used in the present case and the experimental nature of the
implantation procedure, including statements that patients should con-
sent to the surgery with an understanding of the risks and experimental
nature of the procedure. The plaintiffs claimed that the statements in
the articles were admissible to demonstrate that H knew or should have
known that the mesh surgery was experimental and the subject of
medical controversy, and that H failed to properly advise M of the risks
associated with the mesh product. Following a hearing, the trial court
determined that the articles were being offered not for purposes of
notice but for the truth of the matter asserted therein and, therefore,
were inadmissible hearsay. At the conclusion of the trial, the court
directed a verdict in favor of H and another remaining defendant on
the innocent misrepresentation claim. The jury subsequently returned
a verdict in favor of the defendants on the remaining claims, and the
trial court rendered judgment thereon. Thereafter, the plaintiffs appealed
to the Appellate Court, which affirmed the trial court's judgment. The
Appellate Court concluded, inter alia, that the trial court did not abuse
its discretion by excluding the two journal articles on the ground that
they were inadmissible hearsay and that the trial court properly directed
a verdict for the defendants on the innocent misrepresentation claim
because innocent misrepresentation claims primarily apply to business
transactions, typically between a buyer and seller. On the granting of
certification, the plaintiffs appealed to this court. *Held*:
1. The Appellate Court correctly concluded that the trial court did not abuse
its discretion in declining to admit into evidence the two journal articles
offered by the plaintiffs on the ground that those articles were inadmissi-
ble hearsay: the plaintiffs could not introduce the articles for the non-
hearsay purpose of proving what H, as a physician, knew or reasonably
should have known with respect to the experimental nature of the mesh
product and procedure, as the plaintiffs failed to meet their burden of
demonstrating that H read or reasonably should have read the contents
of the articles; moreover, the defendants contested the authority of the
articles, and the trial court did not abuse its discretion in excluding
them for the purpose of establishing that they were so authoritative in
the field that H should have been on constructive notice of their content.
2. The Appellate Court properly upheld the trial court's decision to direct
a verdict for the defendants on the plaintiffs' innocent misrepresentation
claim, this court having concluded that such a claim does not lie in
the context of the present case: innocent misrepresentation claims in
Connecticut generally are governed by § 552C of the Restatement (Sec-
ond) of Torts, which requires that the misrepresentation occur in a
"sale, rental or exchange transaction with another," and, in the present
case, the plaintiffs and H were not parties to such a commercial transac-
tion because M sought out the services of H not to purchase the mesh
product but primarily for the provision of medical services, namely, the
implantation of the mesh product; moreover, this court rejected the
plaintiffs' claim that liability for innocent misrepresentation should be

extended to statements made by physicians in the course of providing medical services because, although § 552C of the Restatement (Second) of Torts acknowledges that claims for innocent misrepresentation may be brought in the context of other types of business transactions, the provision of medical care often requires physicians to provide medical opinions rather than statement of facts, and a physician who makes a false statement of fact still may be liable for misrepresentation; furthermore, even if this court assumed that innocent misrepresentation claims could be pursued in the product liability context, that was of no consequence because the plaintiffs did not seek to recover from H for product liability, and this court declined to apply the doctrine of strict liability for innocent misrepresentations made in the course of providing medical treatment, as such liability would be doctrinally inconsistent with the existing framework governing claims against physicians arising from acts of omission or commission during physician-patient communications.

Argued October 25, 2019—officially released April 15, 2020*

*Procedural History*

Action to recover damages for, inter alia, the defendants' alleged negligent misrepresentation, and for other relief, brought to the Superior Court in the judicial district of Waterbury and tried to the jury before *Zemetis, J.*; thereafter, the court directed a verdict for the defendants on the plaintiffs' innocent misrepresentation claim; subsequently, the jury returned a verdict for the defendant Brian J. Hines et al. on the remaining counts, and the court rendered judgment thereon, from which the plaintiffs appealed to the Appellate Court, *Lavine, Keller* and *Bishop, Js.*, which affirmed the trial court's judgment, and the plaintiffs, on the granting of certification, appealed to this court. *Affirmed.*

*Brenden P. Leydon*, with whom, on the brief, was *Jacqueline E. Fusco*, for the appellants (plaintiffs).

*David J. Robertson*, with whom were *Heidi M. Cilano* and, on the brief, *Malaina J. Sylvestre*, for the appellees (defendant Brian J. Hines et al.).

*Opinion*

ROBINSON, C. J. This certified appeal requires us to consider (1) when exhibits that otherwise would constitute inadmissible hearsay may be admitted to prove notice on the part of the defendant, Brian J. Hines, and (2) whether the tort of innocent misrepresentation extends to communications made by a physician during the provision of medical services. The plaintiffs, Mary Beth Farrell and Vincent Farrell,[1] appeal, upon our grant of their petition for certification,[2] from the judgment of the Appellate Court affirming the judgment of the trial court, rendered after a jury trial, in favor of the defendants Hines and Urogynecology and Pelvic Surgery, LLC,[3] on numerous tort claims, including informed consent, innocent misrepresentation, and negligent misrepresentation, following an unsuccessful pelvic mesh surgery on Mary Beth. See *Farrell* v. *Johnson & Johnson*, 184 Conn. App. 685, 688, 195 A.3d 1152 (2018). On appeal, the plaintiffs challenge the Appellate Court's conclusions that the trial court properly (1) excluded two medical journal articles from evidence as hearsay when they had been offered to prove notice, and (2) directed a verdict for the defendants on their innocent misrepresentation claims. We disagree and, accordingly, affirm the judgment of the Appellate Court.

The Appellate Court's opinion sets forth the following background facts and procedural history. "At some point in 2007, Mary Beth's gynecologist diagnosed her with pelvic organ prolapse. As her condition worsened, her gynecologist recommended that she see Hines, a [urogynecologist], with whom she consulted in late October, 2008. Hines explained that implanting a mesh product into Mary Beth would be the best surgery to treat her condition. Mary Beth agreed to the surgery, and Hines performed the procedure on November 19, 2008." (Footnote omitted.) Id., 688–89.

"Approximately four days after Mary Beth had returned home from the surgery, she experienced excessive bleeding and abdominal pain. Hines initially diagnosed her with two large pelvic hematomas. Mary Beth continued to follow up with Hines; however, she continued experiencing pain. In February, 2009, Mary Beth underwent another surgery during which Hines attempted to remove the mesh product that he had implanted in her. Hines removed as much of the mesh as possible; however, some of the mesh could not be removed because it was embedded in tissue. After a second surgery to remove the mesh in the summer of 2009, Mary Beth still experienced pain and was diagnosed with damage to the pudendal and obturator nerves." Id., 689.

"Mary Beth underwent several additional procedures, such as nerve blocks and mesh removal, but these procedures did not eliminate the pain. The pain that she experienced eventually caused her to resign her posi-

tion as a teacher so she could focus on her health. At the time of trial in January, 2016, Mary Beth was considering additional surgery, which she described as 'major.' " Id.

"The plaintiffs served their original complaint on November 15, 2011. The plaintiffs filed the operative, third amended complaint on December 4, 2015, alleging the following claims against the defendants: (1) lack of informed consent; (2) innocent misrepresentation; (3) negligent misrepresentation; (4) intentional misrepresentation; and (5) loss of consortium." Id., 690.

"The plaintiffs' case was tried to a jury in January, 2016. On January 19, 2016, the court directed a verdict in favor of the defendants on the plaintiffs' innocent misrepresentation claim. On January 20, 2016, the jury returned a verdict for the defendants on the remaining counts, and the court [rendered] judgment on July 13, 2016. The plaintiffs' motion to reargue was denied . . . ." Id.

The plaintiffs then appealed from the judgment of the trial court to the Appellate Court, raising several issues, including that the trial court (1) "abused its discretion by excluding from evidence as hearsay two journal articles," and (2) "improperly directed a verdict in favor of the defendants on the plaintiffs' claim of innocent misrepresentation . . . ." Id., 688. The Appellate Court agreed with the defendants' argument that the trial court did not abuse its discretion by excluding the two journal articles regarding the experimental nature of the surgery on the ground that they were inadmissible hearsay. Id., 699. In addition, the Appellate Court concluded that, under *Johnson* v. *Healy*, 176 Conn. 97, 405 A.2d 54 (1978), and § 552C of the Restatement (Second) of Torts, the trial court properly directed a verdict for the defendants on the innocent misrepresentation claim because "innocent misrepresentation claims primarily apply to business transactions, typically between a buyer and seller, and . . . the theory is based on principles of warranty." *Farrell* v. *Johnson & Johnson*, supra, 184 Conn. App. 703. Accordingly, the Appellate Court unanimously rendered judgment affirming the judgment of the trial court. Id., 708. This certified appeal followed. See footnote 2 of this opinion. Additional facts and procedural history will be set forth as necessary.

I

We first consider whether the Appellate Court properly upheld the trial court's exclusion from evidence of the two articles discussing the experimental nature of the mesh surgery as hearsay. The record reveals the following additional facts and procedural history that are relevant to our resolution of this claim. The plaintiffs sought to introduce into evidence three journal articles for notice purposes, two of which are at issue in this appeal. Those two articles were (1) American College

of Obstetrics & Gynecology, "Pelvic Organ Prolapse," 109 ACOG Prac. Bull. 461 (2007) (ACOG Practice Bulletin), and (2) D. Ostergard, "Lessons from the Past: Directions for the Future," 18 Intl. Urogynecology J. 591 (2007) (Ostergard article). At trial, Hines testified that he received the International Urogynecology Journal as part of his membership in a professional society and that he had read articles in Obstetrics & Gynecology, but he was not aware of and had not read the two specific articles at issue.

The plaintiffs sought to admit the following statement from the ACOG Practice Bulletin: "Given the limited data and frequent changes in marketed products (particularly with regard to type of mesh material itself, which is most closely associated with several of the postoperative risks, especially mesh erosion), the procedures should be considered experimental and patients should consent to surgery with that understanding." With respect to the Ostergard article, the plaintiffs sought to admit the following three statements: (1) "a physician can inform the patient of [the procedure's] experimental nature"; (2) "[t]here is a need for more information with specific graft materials to clarify success and adverse event rates"; and (3) "[w]ithout an adequate evidence base, practitioners cannot determine whether an innovative technique is the most safe and effective method for treating a patient. Without adequate data on the risks and benefits of new treatments, patients are unable to provide a true informed consent."

Both parties submitted briefing on the admissibility of the articles, and the trial court heard argument on January 12, 2016. The trial court, in its ruling, agreed that the plaintiffs were offering the articles for their truth and that they therefore must be excluded as inadmissible hearsay.[4]

On appeal, the plaintiffs argue that the journal articles were admissible because they were offered for nonhearsay purposes, specifically, to show that Hines was on notice of a controversy regarding mesh products. In response, the defendants counter that the trial court properly excluded the articles as hearsay because the plaintiffs failed to show that Hines had read the articles and, therefore, that the articles could not be admitted for notice. The defendants also argue that the articles' probative value was outweighed by their prejudicial effect and that, even if the articles were admissible, any error was harmless.

We begin with the standard of review applicable to a trial court's evidentiary decisions. "[We] examine the nature of the ruling at issue in the context of the issues in the case. . . . To the extent [that] a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and

whether a hearsay exception properly is identified are legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no 'judgment call' by the trial court, and the trial court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In other words, only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought."[5] (Citations omitted.) *State* v. *Saucier*, 283 Conn. 207, 217–19, 926 A.2d 633 (2007). "Thus . . . the function performed by the trial court in issuing its ruling should dictate the scope of review." Id., 219. For example, the interpretation of a rule of evidence is a question of law (e.g., constitutes hearsay), but application of that interpreted rule of evidence is discretionary by the trial court (e.g., a hearsay exception applies). Id., 219–20.

"An out-of-court statement offered to establish the truth of the matter asserted is hearsay." (Internal quotation marks omitted.) Id., 223; see Conn. Code Evid. § 8-1 (3). "The hearsay rule forbids evidence of out-of-court assertions to prove the facts asserted in them. If the statement is not an assertion or is not offered to prove the facts asserted, it is not hearsay. . . . This exclusion from hearsay includes utterances admitted to show their effect on the hearer." (Citation omitted; internal quotation marks omitted.) *State* v. *Hull*, 210 Conn. 481, 498–99, 556 A.2d 154 (1989). "Because, however, the effect on the hearer rationale may be misapplied to admit facts that are not relevant to the issues at trial . . . courts have an obligation to ensure that a party's purported nonhearsay purpose is indeed a legitimate one. . . . Evidence is . . . admissible [only] when it tends to establish a fact in issue or to corroborate other direct evidence in the case. . . . Accordingly, an out-of-court statement is admissible to prove the effect on the hearer only when it is relevant for the specific, permissible purpose for which it is offered." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Miguel C.*, 305 Conn. 562, 574, 46 A.3d 126 (2012); see also E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 8.3.1, p. 503. "The proffering party bears the burden of establishing the relevance of the offered testimony. Unless such a proper foundation is established, the evidence . . . is irrelevant." (Internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 23, 1 A.3d 76 (2010).

Notice is a long recognized nonhearsay purpose in Connecticut. More than eighty years ago, this court

observed: "Admission of testimony of a witness . . . that the day before the accident he had told [the fore-man] . . . that the stone should be removed before someone was injured . . . was not hearsay . . . and was admissible as tending to impute to the defendants notice of the situation and its potential dangers." *Jenkins* v. *Reichert*, 125 Conn. 258, 264, 5 A.2d 6 (1939); see *Rogers* v. *Board of Education*, 252 Conn. 753, 767, 749 A.2d 1173 (2000) (statements in transcript were not inadmissible hearsay because they were offered "for the relevant purpose of showing that the statements had been made in the presence of the plaintiff"); *Whitman Hotel Corp.* v. *Elliott & Watrous Engineering Co.*, 137 Conn. 562, 574, 79 A.2d 591 (1951) (admitting letters from plaintiffs' attorney to defendants to show "the fact of the defendants' knowledge of the claimed effect of their operations, since that knowledge should influence their future conduct").

Although our decision in *State* v. *Saucier*, supra, 283 Conn. 207, contemplates that a hearsay determination, when based on an interpretation of the Code of Evidence, is solely a question of law, it also instructs us to "examine the nature of the ruling at issue in the context of the issues in the case." Id., 217. In the present case, the trial court determined that the two articles were inadmissible hearsay because they were irrelevant with respect to the plaintiffs' asserted nonhearsay purpose. For a trial court to determine that a statement is admissible nonhearsay, the court must find that it is relevant for some reason other than its truth. See E. Prescott, supra, § 8.3.1, p. 503. The plaintiffs' stated purpose for offering the articles was to show that Hines had "notice . . . that there was a lack of sufficient risk-benefit information upon which informed consent could be made at that time. . . . [T]hat's the heart of this case." Thus, the trial court was required to exercise its discretion by finding facts regarding whether Hines had notice of these articles in order to determine whether they were relevant to the stated nonhearsay purpose. Because the trial court was required to make a "judgment call" in determining whether the articles were admissible nonhearsay, we review the court's determination for abuse of discretion and conclude that the trial court did not abuse its discretion.[6]

The purpose of notice evidence is to show an effect on the hearer. See E. Prescott, supra, § 8.8.1, p. 514 ("[a] statement is not hearsay if offered to prove notice to the hearer"); see also 2 R. Mosteller, McCormick on Evidence (8th Ed. 2020) § 249, pp. 196–200. Therefore, if the offering party has failed to demonstrate that the putative listener has heard or read the statement, it is inadmissible to prove notice. See, e.g., *Rotolo* v. *Digital Equipment Corp.*, 150 F.3d 223, 224–25 (2d Cir. 1998) (holding that District Court improperly admitted videotape created by plaintiff's competitor for internal use only as notice evidence against defendant because plain-

tiff presented no evidence that defendant saw tape or reasonably should have seen it); *George* v. *Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) (plaintiff must first prove that defendant's predecessor "saw the unpublished report or that it reasonably should have seen it as part of the published literature in the industry" because, "before [the] plaintiff can argue [nonhearsay] notice she must show that the defendant was at least inferentially put on notice by the report"); *Betts* v. *Manville Personal Injury Settlement Trust*, 225 Ill. App. 3d 882, 924, 588 N.E.2d 1193 (trial court improperly admitted newspaper and magazine articles for notice purposes because "there [was] no evidence anyone at [the defendant company] read these articles such that notice can be established"), cert. denied, 146 Ill. 2d 622, 602 N.E.2d 447 (1992); 4 C. Fishman, Jones on Evidence (7th Ed. 2000) § 24:27, pp. 263–66 ("In civil litigation as well as criminal, a statement may be nonhearsay because it is relevant to show knowledge or notice. . . . But to be relevant for this nonhearsay purpose, the offering party must establish that the adverse party in fact heard, saw or read the statement." (Footnotes omitted.)); R. Mosteller, supra, § 249, p. 197 n.13 ("[o]f course, there must be evidence that the relevant party could hear the statements or they are inadmissible under a notice theory"); see also *State* v. *Rosales*, 136 N.M. 25, 30, 94 P.3d 768 (2004) (explaining that, if evidence was offered to show that witness heard victim's statement, it could prove motive, but, "[i]f [the witness] was unaware of the victim's claim, then [the defendant's] theory that the evidence was not being offered for its truth is difficult to understand").

Courts have concluded that articles are admissible, despite hearsay objections, to show whether a party should have known a fact at issue. See *Coyne* v. *Taber Partners I*, 53 F.3d 454, 461 n.6 (1st Cir. 1995) (allowing newspaper article to show hotel's constructive notice of violent strike); *Toney* v. *Zarynoff's, Inc.*, 52 Mass. App. 554, 562–63, 755 N.E.2d 301 (reversing trial court's exclusion of newspaper articles to show defendants' knowledge of criminal activity in area, even though defendant's operator "had not read them"), review denied, 435 Mass. 1107, 761 N.E.2d 964 (2001). Or, in the context of a manufacturer: "For purposes of determining if it had notice of the hazardous character of its product, [the] defendant was chargeable with knowledge of the entire body of scientific learning and literature relating to that product . . . ." *Marsee* v. *United States Tobacco Co.*, 866 F.2d 319, 326 (10th Cir. 1989). We agree with these decisions insofar as they hold that, if the proponent of an article can demonstrate that another party *should have known* the contents of the article, *because of an independent duty to do so*, it may be admissible to prove notice constructively. For example, manufacturers are "held to the knowledge of an expert in its field . . . and therefore [have] a duty

'to keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby.' " (Citations omitted.) *George* v. *Celotex Corp.*, supra, 914 F.2d 28.

Physicians possess a duty to stay abreast of the state of medical science in their areas of practice. See *Tomer* v. *American Home Products Corp.*, 170 Conn. 681, 687, 368 A.2d 35 (1976) ("[s]ince the defendants could not be held to standards which exceeded the limits of scientific advances existing at the time of their allegedly tortious conduct, expert testimony tending to show the scope of duties owed could have been properly limited to *scientific knowledge existing at that time*" (emphasis added)); C. Williams, Note, "Evidence-Based Medicine in the Law Beyond Clinical Practice Guidelines: What Effect Will EBM Have on the Standard of Care?," 61 Wash. & Lee L. Rev. 479, 508–12 (2004) (describing duty and listing cases). In the present case, the defendants contested the authoritativeness of the two articles at issue. As such, the trial court did not abuse its discretion by excluding them for the purpose of establishing that they were so authoritative in the field that Hines should have been on constructive notice of their content—that is, that he reasonably should have read them. Put differently, because something is published in a journal does not mean, ipso facto, that it represents the state of medical science at the time, such that a physician is charged with a duty to know its contents. But cf. *George* v. *Celotex*, supra, 914 F.2d 28–30 (determining that asbestos report was relevant to defendant's liability because of defendant's duty to know and because of defendant's use of precise value criticized by report).

In the present case, the plaintiffs failed to meet their burden of demonstrating that Hines read or reasonably should have read the contents of these articles. Although one of the underlying issues in the case was what Hines, as a physician, knew or reasonably should have known with respect to the experimental nature of the mesh, the plaintiffs could not use the articles for that purpose without first establishing that Hines was on actual or constructive notice of the articles' contents. Although Hines testified that he had received or read certain articles in the two journals at issue and had published his own article in one of the journals, those facts alone do not permit an inference that, as a result, he read every article in each issue published by each of the journals. Nor did the plaintiffs argue or present evidence to establish an independent duty establishing that Hines reasonably should have read these two articles, beyond his receipt of one of the journals.[7]

The plaintiffs argue that proof of knowledge is not necessary to prove notice. On this point, the plaintiffs rely on *Blue Cross of California* v. *SmithKline Beecham Clinical Laboratories, Inc.*, 108 F. Supp. 2d 116 (D. Conn. 2000). In *Blue Cross of California*, the

court considered the defendant's motion for summary judgment and concluded that "highly publicized information" released by "the national media and various professional organizations" put the plaintiffs on inquiry notice for statute of limitations reasons. Id., 123–24. The court denied the motion to strike the media reports on hearsay grounds because they showed "inquiry notice of the matters reported therein . . . ." Id., 123 n.5. *Blue Cross of California* is not inconsistent with our decision in the present case. The plaintiffs here have not asserted that the experimental nature of the pelvic mesh was a matter covered in "volumes" by the national media; had they done so, they would have a stronger argument that Hines should have known of that issue. Similarly, we disagree with the plaintiffs' reliance on *Kochan* v. *Owens-Corning Fiberglass Corp.*, 242 Ill. App. 3d 781, 610 N.E.2d 683 (1993), overruled by *Nolan* v. *Weil-McLain*, 233 Ill. 2d 416, 910 N.E.2d 549 (2009). In *Kochan,* the trial court permitted the plaintiffs' expert to summarize articles detailing the dangers of asbestos. *Kochan* v. *Owens-Corning Fiberglass Corp.*, supra, 803. The court held that this evidence was "intended to show when, in [the expert's] opinion, it was generally known or should have been known in the industry that asbestos caused asbestosis and was linked to cancer." Id., 805. In the present case, the court allowed one of the three challenged articles to be admitted through the plaintiffs' expert under the learned treatise exception to the hearsay rule under § 8-3 (8) of the Connecticut Code of Evidence to show what Hines knew or should have known, but the plaintiffs failed to establish such a foundation when offering the ACOG Practice Bulletin and the Ostergard article.[8] Accordingly, we conclude that the Appellate Court properly upheld the trial court's conclusion that those two articles were hearsay and not admissible to prove notice.

## II

We next turn to the plaintiffs' claim that the trial court improperly directed a verdict for the defendants on the count of innocent misrepresentation. The record reveals the following additional relevant facts and procedural history. On January 14, 2016, after the close of evidence, the trial court heard arguments on the defendants' motion for a judgment and a directed verdict[9] on several issues, including the innocent misrepresentation claim. At this hearing, the plaintiffs argued, inter alia, that the evidence at trial presented several misrepresentations by Hines, including his: (1) explanation that "I believe[d], not correctly, but I believed I had a pretty good understanding of what the risks of using this product were"; (2) failure to disclose certain payments; and (3) statement that the surgery "will improve [the plaintiffs'] sex life . . . ." The trial court indicated it had several questions regarding the applicability to this case of the tort of innocent misrepresentation and

requested supporting case law from the plaintiffs. The next day, the trial court granted the defendants' motions for a directed verdict and judgment on the innocent misrepresentation claim and later rendered judgment accordingly.[10]

On appeal, the plaintiffs contend that the Appellate Court improperly upheld the trial court's decision to direct a verdict on the innocent misrepresentation counts because it was both procedurally and substantively improper. The plaintiffs argue that claims for innocent misrepresentation are not limited to economic loss, and, therefore, they should have been allowed to present their claimed pecuniary loss to the jury. In addition, the plaintiffs contend that the requisite commercial transaction existed between the parties because Hines was in the business of performing these types of procedures. The defendants counter that the trial court properly directed a verdict on the claim of innocent misrepresentation because there was no commercial relationship between the parties and because "[t]he mesh product that was used was entirely incidental to the medical care that [Hines] rendered to [Mary Beth]." The defendants further argue that there was no factual foundation for the innocent misrepresentation claim, which, they contend, is inapplicable in cases arising from the provision of medical services. We agree with the defendants that the trial court properly directed a verdict because a claim for innocent misrepresentation does not lie as matter of law in this context.[11]

"Whether the evidence presented by the plaintiff is sufficient to withstand a motion for a directed verdict is a question of law, over which our review is plenary. . . . Directed verdicts are not favored. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision [to grant a defendant's motion for a directed verdict] we must consider the evidence in the light most favorable to the plaintiff. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party." (Citation omitted; internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, 328 Conn. 726, 744, 183 A.3d 611 (2018). "At the outset, we note that although we do not generally favor directed verdicts . . . [a] verdict may properly be directed where the decisive question is one of law." (Citation omitted; internal quotation marks omitted.) *Red Maple Properties* v. *Zoning Commission*, 222 Conn. 730, 735, 610 A.2d 1238 (1992).

"In Connecticut, a claim of innocent misrepresentation . . . is based on principles of warranty, and . . . is not confined to contracts for the sale of goods. . . . A person is subject to liability for an innocent misrepresentation if in a sale, rental or exchange transaction

with another, [he or she] makes a representation of a material fact for the purpose of inducing the other to act or to refrain from acting in reliance upon it . . . even though it is not made fraudulently or negligently. . . . We have held that an innocent misrepresentation is actionable, *even though there* [*is*] *no allegation of fraud or bad faith*, because it [is] false and misleading, in analogy to the right of a vendee to elect to retain goods which are not as warranted, and to recover damages for the breach of warranty." (Citations omitted; emphasis added; internal quotation marks omitted.) *Gibson* v. *Capano*, 241 Conn. 725, 730, 699 A.2d 68 (1997).

The seminal Connecticut case concerning innocent misrepresentation is *Johnson* v. *Healy*, supra, 176 Conn. 97. In *Johnson*, this court discussed the evolution of the common-law cause of action for innocent misrepresentation as an amalgam of tort and contract law. "Traditionally, no cause of action lay in contract for damages for innocent misrepresentation; if the plaintiff could establish reliance on a material innocent misstatement, he could sue for rescission, and avoid the contract, but he could not get affirmative relief. . . . In tort, the basis of responsibility, although at first undifferentiated, was narrowed, at the end of the [nineteenth] century, to intentional misconduct, and only gradually expanded, in this century, to permit recovery in damages for negligent misstatements. . . . At the same time, liability in warranty, that curious hybrid of tort and contract law, became firmly established, no later than the promulgation of the Uniform Sales Act in 1906. In contracts for the sale of tangible chattels, express warranty encompasses material representations which are false, without regard to the state of mind or the due care of the person making the representation. For breach of express warranty, the injured plaintiff has always been entitled to choose between rescission and damages. Although the description of warranty liability has undergone clarification in the Uniform Commercial Code, which supersedes the Uniform Sales Act, these basic remedial principles remain unaffected. At the same time, liability in tort, even for misrepresentations which are innocent, has come to be the emergent rule for transactions that involve a commercial exchange." (Citations omitted; footnote omitted.) Id., 100–101; see also 3 Restatement (Second), Torts § 552C, p. 141 (1977); 3 Restatement (Second), supra, § 524A, p. 51.

In *Johnson*, this court upheld the trial court's verdict for the plaintiffs on their innocent misrepresentation claim. *Johnson* v. *Healy*, supra, 176 Conn. 102–103. The plaintiffs had relied on affirmative statements by the defendant that "the house was made of the best material, that he had built it, and that there was nothing wrong with it" when deciding to make their purchase. Id., 98–99. Because strict liability for innocent misrepresentation "is based on principles of warranty" that are clearly established in sales of goods, the court con-

sidered whether such warranty law extended to sales of real estate. Id., 101–102. The court held that such an extension was appropriate in this context because caveat emptor was no longer a barrier to misrepresentation and warranty law applied in the sale of "new homes . . . ." Id., 102.

In the present case, the plaintiffs seek to extend liability for innocent misrepresentation even further, effectively rendering physicians strictly liable for statements they make in the course of medical treatment. Unlike in *Johnson*, we are not persuaded that these facts dictate an extension of liability.

First, in Connecticut, the tort of innocent misrepresentation generally is governed by § 552C of the Restatement (Second),[12] which requires "a sale, rental or exchange transaction with another" before liability attaches. See *Gibson* v. *Capano*, supra, 241 Conn. 730 (relying on § 552C in innocent misrepresentation case involving sale of property); see also *Bartholomew* v. *Bushnell*, 20 Conn. 271, 274 (1850) (sale of horses); *Little Mountains Enterprises, Inc.* v. *Groom*, 141 Conn. App. 804, 806, 64 A.3d 781 (2013) (sale of real property); *Matyas* v. *Minck*, 37 Conn. App. 321, 333, 655 A.2d 1155 (1995) (same). The commentary to § 552C of the Restatement (Second) illuminates this language further, explaining that it encompasses "any sale, rental or exchange of land, chattels, securities or anything else of value, such as copyrights, patents and other valuable intangible rights." 3 Restatement (Second), supra, § 552C, comment (c), p. 144; see W. Prosser, Torts (4th Ed. 1971) § 107, p. 711 ("a large group of the American courts have succeeded in prying open the door, and extending strict liability to express representations made in the *course of other commercial dealings*, such as the sale of land, securities, or patent rights" (emphasis added)).

The few courts that have considered this issue have concluded that the provision of professional services is not a commercial transaction for purposes of § 552C of the Restatement (Second). See *Adams* v. *Allen*, 56 Wn. App. 383, 385, 393, 783 P.2d 635 (1989) (holding that "sale, rental or exchange transaction" language in § 552C is inapplicable to physician's representations in course of prescribing medication), overruled on other grounds by *Caughell* v. *Group Health Cooperative of Puget Sound*, 124 Wn. 2d 217, 876 P.2d 898 (1994). Similarly, with respect to other professional services, the United States District Court for the District of Massachusetts granted a motion to dismiss when a plaintiff sought to hold a law firm liable for alleged misrepresentations regarding "the tax advantages of [an] investment" under a theory of innocent misrepresentation because the law firm was "not a party to any sale . . . ." *Norman* v. *Brown, Todd & Heyburn*, 693 F. Supp. 1259, 1260, 1264–65 (D. Mass. 1988).

In the present case, Mary Beth did not seek out Hines

for the purpose of purchasing a product; instead, as the complaint alleges, she sought his services in implanting the pelvic mesh. Therefore, Mary Beth's purchase of the mesh was secondary to the main purpose of the transaction, namely, to seek surgical assistance for her pelvic organ prolapse. Hines, as a urogynecologist and a surgeon, did not function primarily as a seller of pelvic mesh. See *Zbras* v. *St. Vincent's Medical Center*, 91 Conn. App. 289, 294, 880 A.2d 999 ("[t]he transaction in this case, a surgery, clearly was labeled a service rather than the sale of a product"), cert. denied, 276 Conn. 910, 886 A.2d 424 (2005). For these reasons, and in the absence of any authority cited by the plaintiffs to the contrary, we conclude that Hines' provision of medical services did not qualify as a "sale, rental or exchange transaction" under § 552C of the Restatement (Second), and, therefore, a claim for innocent misrepresentation does not lie under our existing innocent misrepresentation precedent.[13] Although the plaintiffs assert that there was a commercial transaction between the parties, the core of their argument necessarily seeks to extend liability for innocent misrepresentations outside of commercial transactions.

Liability outside of "a sale, rental or exchange transaction" is not categorically excluded by the Restatement, as that provision includes a caveat declining to opine on "other types of business transactions, in addition to those of sale, rental and exchange, in which strict liability may be imposed for innocent misrepresentation under the conditions stated in [§ 552C]."[14] 3 Restatement (Second), supra, § 552C, caveat, pp. 141–42; see also *E. & F. Construction Co.* v. *Stamford*, 114 Conn. 250, 257–59, 158 A. 551 (1932) (building contractor could recover because of town's innocent misrepresentation of amount of rock that contractor would be required to excavate under contract for services). As a result, we next consider whether liability for innocent misrepresentations should be extended to statements made during the provision of medical services.

The plaintiffs argue that, "[i]f someone can be held liable for innocent misrepresentation in the sale of a horse, what possible reason is there to immunize a doctor—who owes a fiduciary duty to his patient—for similar omissions?" In addition, they argue that General Statutes § 52-572m (b),[15] the statute that governs product liability claims, permits recovery for personal injury damages from innocent misrepresentations. The defendants counter that personal injury damages are more appropriately obtained from malpractice actions that lie in negligence rather than in strict liability. They posit that "[i]t is not difficult to imagine the mischief that can potentially ensue if, rather than having to prove a medical malpractice case through expert testimony, a plaintiff could potentially recover some or all of the same damages by asserting instead that the alleged harm that was suffered at the hands of the physician

was due to 'innocent misrepresentation,' in other words strict liability for the doctor not knowing before the procedure was undertaken that the outcome would be unfavorable." We agree with the defendants and conclude that strict liability should not extend to innocent misrepresentations made during the provision of medical services in this instance.

We initially note that the few courts that have considered this issue have uniformly declined to hold physicians strictly liable for statements made in the course of medical treatment. See *Christensen* v. *Thornby*, 192 Minn. 123, 126, 255 N.W. 620 (1934) (declining to hold surgeon strictly liable for representations in absence of negligence or fraudulent intent); *Black* v. *Gundersen Clinic, Ltd.*, 152 Wis. 2d 210, 214, 448 N.W.2d 247 (App.) ("[w]e have not recognized the imposition of liability upon a doctor under the strict liability doctrine based upon misrepresentation"), review denied, 449 N.W.2d 276 (Wis. 1989). Unlike product sellers, the medical profession requires the exercise of a highly particularized skill and is often accompanied by medical *opinions* rather than statements of fact.[16] That is not to say that a physician can never make a false statement of fact, because, if and when he or she does, a patient may sue the physician for misrepresentation. See, e.g., *Doe* v. *Cochran*, 332 Conn. 325, 342–45, 210 A.3d 469 (2019); *Duffy* v. *Flagg*, 279 Conn. 682, 697, 905 A.2d 15 (2006). But, on the facts presented by this case, the plaintiffs have not pointed to any persuasive policy reason for why this current misrepresentation scheme is insufficient and should be extended to include innocent misrepresentations.

The plaintiffs argue, however, that public policy permits the recovery of damages for personal injuries resulting from innocent misrepresentations because such claims are permitted as product liability claims under § 52-572m (b). See, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 438, 119 A.3d 462 (2015) (legislature has "primary responsibility in pronouncing the public policy of our state" (internal quotation marks omitted)). We disagree. First, the fact that the legislature included the types of damages permitted in a product liability claim in the first sentence of the statute does not suggest that every theory in the following sentence permits such damages in any case against any defendant that implicates a defective product. See footnote 15 of this opinion (quoting text of § 52-572m (b)). Second, and most significant, the plaintiffs did not assert a product liability claim against Hines in this case. Thus, even if we assume without deciding that personal injury damages are permitted for innocent misrepresentation claims in a product liability context, this would be of no consequence in the present case.

Finally, the plaintiffs have not presented any authority applying strict liability for misrepresentations to

medical services. This is likely because such strict liability for misrepresentations is doctrinally inconsistent with the existing framework governing claims against physicians arising from acts of omission or commission during physician-patient communications. Under the doctrine of informed consent, a physician must "provide the patient with that information which a reasonable patient would have found material for making a decision whether to embark upon a contemplated course of therapy." (Internal quotation marks omitted.) *Duffy* v. *Flagg*, supra, 279 Conn. 691. Permitting a patient to sue for innocent misrepresentation would drastically alter this standard by rendering a physician liable for *any* inaccuracies that may be discovered in the future, not only those a reasonable patient would have found material at the time. This is inconsistent with the "numerous cases holding that a doctor is not liable for failing to warn a patient of risks flowing from an unknown and unknowable condition." *Latham* v. *Hayes*, 495 So. 2d 453, 461 (Miss. 1986) (Anderson, J., dissenting).[17] Because a reasonable patient could not expect to be informed of currently unknown risks, we decline to replace this state's informed consent action with one that would make physicians strictly liable for innocent statements made in the course of treatment.[18] Accordingly, we conclude that the Appellate Court properly upheld the trial court's decision to direct a verdict on the plaintiffs' innocent misrepresentation claim.[19]

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* April 15, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] For the purpose of simplicity, we refer to each of the plaintiffs individually by first name when appropriate.

[2] We granted the plaintiffs' petition for certification to appeal, limited to the following issues: "Did the Appellate Court correctly determine that the trial court did not improperly rule that the journal articles, offered to prove notice, were inadmissible as hearsay?" And "[d]id the Appellate Court correctly conclude that the theory of innocent misrepresentation is not applicable in the present case and that the trial court properly directed a verdict in favor of the defendants on this claim?" *Farrell* v. *Johnson & Johnson*, 330 Conn. 944, 944–45, 197 A.3d 389 (2018).

[3] The plaintiffs withdrew the action as to the defendant American Medical Systems, Inc., in July, 2015, and as to the remaining defendants, Johnson & Johnson, Ethicon, Inc., Ethicon Women's Health and Urology, Gynecare, A Division of Ethicon, Inc., and Stamford Hospital, in January, 2016. Accordingly, all references herein to the defendants are to Hines and Urogynecology and Pelvic Surgery, LLC, and we refer to each individually by name when appropriate.

[4] At the hearing on the articles' admissibility, the trial court and the plaintiffs' counsel engaged in the following colloquy:

"The Court: I think that these are hearsay documents. . . . And the fact that they're being described as being offered for notice, I think that [the defendants'] most recent brief is exactly on point with my thinking; that is, that these [articles] are actually being offered for the truth of the matter contained. . . . So, under the circumstances, I think these [articles] are hearsay, and I don't see their existence, the fact [that] they exist, being relevant to any issue we have in front of us. And, for those reasons, I'm going to sustain the objection to the offer of these articles. . . . The fact [that] a medical controversy exists, the fact that, in these various authors' opinions, inadequate study has been done, that physicians have an obligation to advise their patients that inadequate study has been done, that there's

not a scientific basis for the use of this mesh product and implantation of this product into patients absent such scientific basis and study. I'm understanding that's the thrust of the case, but that's the truth of the matter contained in each of these three articles. That's why I think that they are hearsay.

"[The Plaintiffs' Counsel]: The fact [that] there was a controversy in the medical community, the claim is that's a fact that should have been related to [Mary Beth].

"The Court: Don't you see that's the truth of the matter contained?

"[The Plaintiffs' Counsel]: No. A publication in a proceeding saying there's a controversy here, it's basically a declaration of fact. The fact it was published shows there is a controversy.

"The Court: No, it doesn't. It shows [that] the articles are published. And, if the question was before us whether these articles were published and that [was] a relevant fact, but not the topics within the articles, not the content of the articles. That's the truth of the matter contained. That the articles exist and that you perceive them to create a medical controversy that Hines should have informed [Mary Beth] of, I understand, but that exactly looks to the truth of the matter contained in these [articles] that there is such a controversy, that he does have such an obligation. . . . I do understand that the purpose of this is to show that three articles exist in journals that he received before he instructed [Mary Beth] as to the risk, benefits and alternatives, and that he either read these and forgot [about] them or didn't read them, and that he had an opportunity to read them. Had he read them, the content of those [articles] would have alerted him that there was a medical controversy or inadequate scientific basis for the implantation of this mesh product . . . here. That seems to me to be the heart of the question as to the adequacy of the instruction. You're saying to me [that] the content of these articles is such that [Hines] should have warned her of [their] contents. I think that's the classic definition of, we're not offering them for the existence of those but, rather, for the truth of the matter contained within them, that there is a controversy."

[5] The plaintiffs contend that, although the Appellate Court utilized the correct legal standard initially, the court then improperly applied abuse of discretion review when it stated: "The court properly determined that the articles were inadmissible hearsay and did not fall within a hearsay exception and, accordingly, did not abuse its discretion in excluding the articles from evidence." *Farrell* v. *Johnson & Johnson*, supra, 184 Conn. App. 699. We disagree. We discuss the difficulty in applying this standard to the present case in footnote 6 of this opinion.

[6] The standard of review set forth in *Saucier* can complicate appellate review of a trial court's hearsay determination. We note that Justice Norcott presciently foreshadowed this difficulty in his concurring opinion in *Saucier*. He disagreed with the majority's conclusion that "whether a statement is hearsay require[s] determinations about which reasonable minds may not differ; there is no judgment call by the trial court, and the trial court has no discretion to admit hearsay in the absence of a provision providing for its admissibility." (Internal quotation marks omitted.) *State* v. *Saucier*, supra, 283 Conn. 240 (*Norcott, J.*, concurring in part). Instead, according to Justice Norcott, trial courts' hearsay determinations should receive appellate deference because they often involve the "very kind of case and fact sensitive determination for which a trial court is particularly well suited." Id., 241 (*Norcott, J.*, concurring in part).

[7] The trial court's other rulings reflected the importance of notice to the admissibility of evidence that otherwise would be hearsay. For example, the trial court admitted a Food and Drug Administration (FDA) public health notification into evidence for notice purposes. The FDA notification discussed "[c]omplications [a]ssociated with [t]ransvaginal [p]lacement of [s]urgical [m]esh" for pelvic organ prolapse and stress urinary incontinence and recommended certain actions for physicians. During the plaintiffs' examination of Hines, the plaintiffs established that he was aware of and had read that FDA notification, although he was not sure when he had first seen it. In the court's evidentiary ruling, it explained that the exhibit would be admitted because it showed "the effect on the doctor and what he knew or should have known with respect to the status of this type of surgical procedure so that he could adequately advise his patients as to the risks, benefits, and alternatives."

[8] Accordingly, even if we assume, without deciding, that the trial court incorrectly concluded that the two articles were hearsay, we could uphold its evidentiary ruling on the alternative ground; see, e.g., *State* v. *Burney*, 288 Conn. 548, 560, 954 A.2d 793 (2008); that the plaintiffs failed to lay a proper foundation to prove their relevance. See *Price* v. *Rochford*, 947 F.2d

829, 833 (7th Cir. 1991) ("no hearsay problem" because articles reporting plaintiff's bankruptcy were not offered for their truth, but articles had low probative value because plaintiff "offered no specific facts tending to show that any of the defendants read these articles or even that they read the newspapers in which the articles appeared"); *Evans* v. *Hood Corp.*, 5 Cal. App. 5th 1022, 1044, 211 Cal. Rptr. 3d 261 (2016) (trial court properly excluded nonhearsay evidence offered for notice purposes because plaintiff failed to establish that defendants knew about documents, which had low probative value).

[9] The defendants made both a "motion for judgment at the end of [the] plaintiffs' case-in-chief and . . . [a motion] at the end of the evidentiary portion of the case for [a] directed verdict."

[10] In granting the defendants' motions, the trial court indicated that it would not submit the plaintiffs' innocent misrepresentation claim to the jury because the plaintiffs had failed to produce case law establishing the claim's applicability in the informed consent context. The trial court also stated that it had performed its own research and could not reconcile the existing case law on innocent misrepresentation and its damages calculations with the claims in the present case.

[11] Procedurally, the plaintiffs argue that the trial court improperly allowed the defendants to raise the issue without ever raising the inapplicability of an innocent misrepresentation claim in any dispositive pretrial motions. The plaintiffs also claim that the trial court sua sponte raised the inapplicability of innocent misrepresentation because the defendants argued only that there was insufficient evidence to support a misrepresentation claim. In regard to any procedural impropriety, the defendants contend that they did raise "the legal insufficiency of the plaintiffs' claims by way of a special defense" in their answer because the trial court had earlier precluded them from filing a motion to strike.

The defendants moved for a directed verdict on several issues, including the insufficiency of the evidence to support the plaintiffs' claim of innocent misrepresentation, on January 14, 2016. After the defendants' motion, the trial court discussed the inapplicability of innocent misrepresentation and heard arguments from the parties. The next day, the court directed a verdict on innocent misrepresentation in the absence of any supporting case law from the plaintiffs. This was not improper. Motions for directed verdicts are properly made at the close of a plaintiff's evidence, which the defendants did here. Practice Book § 16-37; see also *State* v. *Perkins*, 271 Conn. 218, 271, 856 A.2d 917 (2004) (*Katz, J.*, dissenting) ("a motion for a directed verdict [is] made after the close of the plaintiff's case in a civil trial"). The trial court did not improperly raise the issue sua sponte but, instead, considered the applicability of innocent misrepresentation after the defendants moved for a directed verdict. The defendants' argument regarding the sufficiency of the evidence was a proper mechanism under which the trial court could consider the legal sufficiency of the plaintiffs' claim. See *Fisher* v. *Big Y Foods, Inc.*, 298 Conn. 414, 440, 3 A.3d 919 (2010) ("if, as a matter of law, [a claim for innocent misrepresentation] was not implicated by the circumstances of this case, then the trial court was required to direct a verdict in the defendant's favor"). Although this issue might have been more efficiently resolved as a pretrial matter, the trial court did not improperly direct the verdict on the plaintiffs' innocent misrepresentation claim because, as a matter of law, the court could not submit this claim to the jury.

[12] Section 552C of the Restatement (Second) of Torts provides: "(1) One who, in a sale, rental or exchange transaction with another, makes a misrepresentation of a material fact for the purpose of inducing the other to act or to refrain from acting in reliance upon it, is subject to liability to the other for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation, even though it is not made fraudulently or negligently.

"(2) Damages recoverable under the rule stated in this section are limited to the difference between the value of what the other has parted with and the value of what he has received in the transaction." 3 Restatement (Second), supra, § 552C, p. 141.

[13] This conclusion by no means creates a per se rule that physicians may never be held liable for innocent misrepresentations of fact under § 552C of the Restatement (Second). There are a growing number of situations in which a physician may be a party to a commercial transaction as the business of healthcare evolves. See L. Churchill, "The Hegemony of Money: Commercialism and Professionalism in American Medicine," 16 Cambridge Q. Healthcare Ethics 407, 410–12 (2007) (discussing commercialization of practice of medicine). But, outside of the fact that Hines routinely performs such surger-

ies, the plaintiffs have not presented any persuasive reason that transforms Hines' provision of medical services into a "sale, rental or exchange transaction . . . ."

[14] Comment (g) to § 552C of the Restatement (Second) of Torts explains the caveat: "There have, however, been occasional decisions in which the same rule has been applied to other types of business transactions, such as the issuance of an insurance policy or the inducement of an investment or a loan. . . . The law appears to be still in a process of development and the ultimate limits of the liability are not yet determined." 3 Restatement (Second), supra, § 552C, comment (g), p. 145; see also A. Hill, "Damages for Innocent Misrepresentation," 73 Colum. L. Rev. 679, 704 (1973) ("[a]s to why cases like this are relatively uncommon, one may suppose that in some significant classes of contracts, such as those for services, representations of fact are infrequent as compared with representations of opinion; and that in other significant classes, such as those for the sale of real property, the extensive use of form contracts results in severe obstacles to proof of such representations, if made").

[15] General Statutes § 52-572m (b) provides: " 'Product liability claim' includes all claims or actions brought for *personal injury*, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product. 'Product liability claim' shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; *misrepresentation* or nondisclosure, whether negligent or *innocent*." (Emphasis added.)

[16] Actions for fraudulent and negligent misrepresentation in Connecticut require the representation to be one of fact. See *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 73, 873 A.2d 929 (2005) ("an action for negligent misrepresentation requires the plaintiffs in the present case to prove that [the defendant] made a misrepresentation of fact"); *Crowther* v. *Guidone*, 183 Conn. 464, 467, 441 A.2d 11 (1981) ("[i]t is true that our cases have consistently required that, as one element of fraudulent misrepresentation, a representation be made as a statement of fact"). We need not decide, in this case, whether a false statement made as part of a medical opinion could support a cause of action for misrepresentation. See, e.g., *Van Leeuwan* v. *Nuzzi*, 810 F. Supp. 1120, 1124 (D. Colo. 1993); *Custodio* v. *Bauer*, 251 Cal. App. 2d 303, 314, 59 Cal. Rptr. 463 (1967); see also F. Harper & M. McNeely, "A Synthesis of the Law of Misrepresentation," 22 Minn. L. Rev. 939, 951–52 (1938) (discussing opinion versus fact distinction).

[17] Cf. *Howard* v. *University of Medicine & Dentistry of New Jersey*, 172 N.J. 537, 553–54, 800 A.2d 73 (2002) ("we are not convinced that our common law should be extended to allow a novel fraud or deceit-based cause of action in this doctor-patient context that regularly would admit of the possibility of punitive damages, and that would circumvent the requirements for proof of both causation and damages imposed in a traditional informed consent setting").

[18] The plaintiffs argue that informed consent actions do not displace claims for misrepresentation against physicians such as those brought under *Duffy* v. *Flagg*, supra, 279 Conn. 682. We disagree. In *Duffy*, this court likely was not envisioning liability for innocent misrepresentations about the treatment to be rendered, as it specifically was considering misrepresentations regarding "the physician's skills, qualifications, or experience," which are topics uniquely within the physician's knowledge. Id., 697. Put differently, it is rather difficult to contemplate that a physician would or could innocently misrepresent his or her own experience in a material way.

[19] Although our case law does not expressly preclude damages for personal injuries arising from innocent misrepresentations, we observe that such liability would be inappropriate in the present case. "The defendant may be subjected to liability for innocent misrepresentation causing *stand-alone economic harm* when the defendant undertakes to guarantee the truth of the matter represented, that is, when his representation is a warranty. Where a warranty is breached, the plaintiff may *recover the contract or loss of bargain measure of damages*." (Emphasis added.) 3 D. Dobbs et al., The Law of Torts (2d Ed. 2011) § 669, p. 661; see 3 Restatement (Second), supra, §552C, comment (f), p. 145 (noting that innocent misrepresentation damages "are restitutionary in nature" and "in effect [restore the plaintiff] to the pecuniary position in which he stood before the transaction," and that, because "the defendant's misrepresentation is an innocent one, *he is not*

*held liable for other damages*; *specifically, he is not liable for benefit of the bargain or for consequential damages*" (emphasis added)); see also *Johnson* v. *Healy*, supra, 176 Conn. 106 ("[t]he proper test for damages was the difference in value between the property had it been as represented and the property as it actually was"). Thus, it appears that this damages calculation would not provide the plaintiffs with any significant relief because the damages for personal injuries stemming from the mesh would be limited to the difference between what the plaintiffs paid for the mesh product and the value of the mesh retained.

―――――――――――――――――――